THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. WILLIAM SADLER.

1. REVERSAL — *Errors Must be Grave and Material.* When the whole record taken together shows an unusually fair trial, the instructions of the court, and the special findings and the general verdict of the jury being free from every appearance of passion or prejudice, and substantial justice is done, the errors that compel a reversal of such a case must be very grave and material ones.

2. DEFECTIVE TOOLS — *New Ones, Promised — Injured Employé — Recovery.* A section foreman told employés on his section that the railroad company had promised to send him new tools in place of those in use, known to be defective. This promise inured to the benefit of all employés at work on the section in whose hearing and presence it was made; and if, after a reasonable time has elapsed, and the new tools are not furnished, an employé on the section is injured by the use of the defective tool, the company cannot defeat his recovery because the promise was not made to the injured employé individually.

*Error from Johnson District Court.*

ON December 29, 1885, plaintiff below filed his petition in the Johnson county district court against the Atchison, Topeka & Santa Fé Railroad Company, as follows ( court and title omitted):

"The said William Sadler, plaintiff herein, complains of the said defendant, the Atchison, Topeka & Santa Fé Railroad Company, defendant herein, for that the defendant is now and was at the date hereinafter stated a railroad corporation duly organized under the laws of the state of Kansas, with its principal office in said state, and has an office in Johnson county, in said state, and does business in said county through which its said line of railway and its cars run and are operated.

"The plaintiff, complaining, states that on or about the 31st day of March, 1885, he entered the employ of defendant company in said county as a day workman, to repair the defendant's road-bed, and was commonly called and known as a section hand, on section number five of Kansas City division, in said county, which said section laborers or 'gang' was composed of a boss or foreman and from six to ten men in the employ of the defendant company in and about its track and road-bed; that on or about the 15th day of June, 1885, while in the employ of defendant company as such section hand on said division, and at or near Waseka or Holliday in said county, under the direction and instruction of the then 'boss' or foreman, to wit, one Louis Damies, the plaintiff was ordered by said boss to drive 'spikes' and fasten down the iron rails to the sleepers belonging to said company, with a certain sledge hammer or iron maul, furnished by the defendant company, which labor the plaintiff did, and while performing such labor and not being familiar with that branch of the work, and without any fault or negligence on his part, and by reason of the fault, carelessness and gross negligence of the defendant company, and when the plaintiff was striking the iron spike with said maul, the said spike which was about five inches in length, flew from under the blow of said maul and the spike came in contact with, and struck the plaintiff's left leg between the knee and ankle-joint thereof, cutting through his pants and lacerating the flesh and fracturing the bone, tendons and muscles of said left leg aforesaid, causing the blood to flow and thereby producing great pain and suffering,

9 — 38 KAS.

and thereby disabling the plaintiff and preventing him from work and earning a livelihood from about the 15th day of June, 1885, until the filing of this petition; that by reason thereof said leg is now in such injured and dangerous condition that amputation of said leg at the knee-joint will shortly become necessary; that abscesses formed upon said leg and passed to the ankle-joint aforesaid and produced great pain and suffering, and have caused blood poison and gangrene and erysipelas to set in, thereby disabling him and greatly endangering the said limb and life of plaintiff; that said company was guilty of gross carelessness and gross negligence in furnishing said tool or maul to plaintiff to work with; and that said tool or iron maul so furnished by defendant company to plaintiff, at the time the said injury was received by him as aforesaid, was unsafe, and worn out, a piece was broken out of the face of it, and was defective and dangerous; all of which the said defendant company well knew prior to and at the time of furnishing the same as aforesaid, as well prior to and at the time of the injury being done as aforesaid, wherein and whereby the said defendant company was grossly careless and grossly negligent, and that by reason thereof the said plaintiff was injured and disabled as aforesaid, and without any fault or negligence upon his part, to his damage in the sum of five thousand dollars.

" Plaintiff therefore demands judgment against said defendant company for the sum of five thousand dollars, his damages so as aforesaid sustained, with costs of suit."

## ANSWER.

"1. Now comes the said defendant, and for answer to the plaintiff's petition filed in the above entitled-cause denies each and every material allegation therein contained.

"2. For a second and further defense the defendant says that the injuries sustained by plaintiff were either the result of accident, or the carelessness and negligence of said plaintiff, and were not occasioned by the negligent act or omission of said defendant, its agents or servants.   And therefore defendant prays judgment for costs."

## REPLY.

"The said William Sadler, plaintiff herein, for his reply to the answer of the defendant herein denies each and every allegation in said answer contained inconsistent with the averments and allegations contained in plaintiff's petition herein."

Trial at the March Term, 1886. The court gave the following instructions:

"1. The burden rests upon the plaintiff to establish his right to recover a judgment against the defendant in this action by a preponderance of the evidence.

"2. By a preponderance of the evidence is not necessarily meant the greatest number of witnesses, but that evidence which is, in the judgment of the jurors, after a consideration and examination of all the evidence, entitled to the greatest weight.

"3. The jury are the sole and exclusive judges of the weight of the evidence and the credibility of the witnesses.

"4. If, after an examination and consideration of all the evidence, the jury believe that any witness has willfully and corruptly testified falsely concerning any material fact in controversy, you may disregard the whole or any part of the evidence of such witness. There is no inflexible rule requiring the jury to believe or disbelieve all or any particular portion of the evidence of any witness.

"5. To entitle plaintiff to recover in this action, it must appear, first, that the plaintiff was injured while in the employment of the defendant railroad company, and in the regular course of such employment; second, that such injury was caused by the negligence of the defendant company or its employés or agents, or by the mismanagement of its employés, to the plaintiff.

"6. An employé of a railroad company, by virtue of his employment, assumes all of the ordinary and usual risks and hazards incident to his employment.

"7. As between a railroad company and its employés, the railroad company is not an insurer of the perfection of any of its machinery, appliances or instrumentalities for the operation of its railroad.

"8. As between the railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of the road, and for the use of such employés.

"9. As between the parties to this action, the defendant would not necessarily be negligent in the use of defective tools not obviously defective; but is negligent in such cases only where it has notice of the defects, or where it has failed to exercise reasonable and ordinary care and diligence in discover-

ing them, and remedying them. And the plaintiff must prove such defects by a preponderance of the evidence, and also that the railroad company had notice of the defective or dangerous condition of such tools, or that, by the exercise of reasonable and ordinary care and diligence, it might have obtained such notice.

"10. To entitle the plaintiff to recover in this action, it must appear from the evidence that the injury complained of was caused by the negligence of the defendant. If the injury was the result of the want of ordinary care on the part of the plaintiff and the defendant, or by the use of ordinary care the plaintiff might have avoided the injury, the plaintiff cannot recover in this action.

"11. By ordinary care is meant that degree of care which an ordinarily careful and prudent man would reasonably be expected to use under the circumstances.

"12. If the plaintiff, as the employé of defendant, was injured in consequence of defendant's negligence, and such injury was subsequently aggravated by the want of ordinary care, or by the negligence of the plaintiff, such fact should be considered in mitigation of damages, but cannot defeat plaintiff's right to recover for injuries for which defendant is responsible.

"13. If an employé knows that the materials or tools with which he works are defective or dangerous, and he continues his work without objection, and without being induced by his employer to believe that a change will be made, he will be deemed to have assumed the risk of using such defective or dangerous tools, and cannot recover for an injury resulting therefrom.

"14. If the jury find from the evidence that the defendant furnished its employés, including plaintiff in this action, defective and unsafe tools to work with; that both plaintiff and defendant had knowledge of the defective and dangerous condition of said tools, but that defendant promised said employés to repair said tools, or replace them with new tools, and plaintiff, with knowledge of said promise on the part of defendant, remained in the employment of defendant, and continued to use said defective and dangerous tools; and within a reasonable time for the fulfillment of said promise, and in the regular course of his employment as aforesaid, plaintiff was injured by reason of the defective and unsafe condition of said tools, then I charge you that it is a question of fact for the jury

whether the plaintiff was guilty of contributory negligence in continuing in said employment under such circumstances."

The defendant asked the court to give certain instructions, among which are the following:

"1. I instruct you that under the law and the evidence in this case you must find a verdict for the defendant." (Refused, and excepted to by defendant.)

"2. When a servant enters in the employ of another, he assumes all the risks ordinarily incident to the business. He is presumed to have contracted with reference to all the hazards and risks ordinarily incident to the employment, and consequently he cannot recover for injuries resulting to him therefrom, (and the court adds: 'And not from the negligence of his employer'.) There are risks and dangers incident to most employments, and those risks the parties have in view when engagements for services are made, and in consideration of which the rate of compensation is fixed. In all engagements of that character the servant assumes those risks that are incident to the service, and as between himself and the master, he is supposed to have contracted on those terms." (Given as modified, to which modification defendant excepted.)

"5. If you find from the evidence that the plaintiff had been engaged in spiking down rails for the defendant a portion of the day previous to the day on which he was injured, and using the same class of spikes that he was using on the day he was injured, and that afterward, on the day of the injury, he continued to spike down rails, using the same class of spikes, from about eleven o'clock in the forenoon until noon, and after dinner until about evening, when he was injured, and used the maul during this day which he was using at the time of the injury, and that by a glance or casual observation a person of good sight could have seen and known that the spikes plaintiff was using were old, rusty and greasy, and that by turning the face of the hammer a person of good sight could at a glance instantly have seen the condition of the face of the maul, then I instruct you that it would be culpable negligence on the part of the plaintiff not to know the condition of the maul and spikes he was using; and if he did know the condition of the maul and spikes which he was using, then he assumed all the risks of injury from accidents resulting from the condition of the spikes or maul, or both; and if he did not know the condition, then by reason of his culpable negligence he would be prevented from recovering a judgment in this case." (Refused, and excepted to by defendant.)

SPECIAL QUESTIONS ANSWERED FOR PLAINTIFF.

"*Ques. 1:* Was the plaintiff in the employment of the defendant company as a section hand, and at work at the time and place of receiving the injury complained of ? *Ans.:* Yes.

"Q. 2. Was the plaintiff then and there under the instructions and orders of a foreman in the defendant's employment ? A. Yes.

"Q. 3. Did the said foreman then have authority to employ and discharge men under him? A. Yes.

"Q. 4. Was the alleged injury caused by a tool used by plaintiff furnished him by the company through the foreman ? A. Yes.

"Q. 5. Was the tool furnished in a reasonably safe and serviceable condition at the time it was furnished and at the time of receiving the alleged injury ? A. The tool was defective.

"Q. 6. Did the said foreman know at the time of furnishing said tool to plaintiff, that the said tool was not reasonably safe and was in an unserviceable condition ? A. The foreman knew that the mauls were defective.

"Q. 7. Did the plaintiff know at the time of, or even prior to the time that he received the injury, the unsafe and unserviceable condition of said tool ? A. He knew that the mauls were defective.

"Q. 7½. Did the plaintiff examine the maul to any extent before he began its use on the day he was injured ? A. He partially examined it.

"Q. 8. Who had control and care of said tool when not in actual use ? A. The foreman.

"Q. 9. At the time of receiving said injury was plaintiff guilty of any fault, or of any negligence, or of any want of ordinary care, contributing to the injury ? A. No.

"Q. 10. Was the plaintiff at the time of receiving the injury in the exercise of reasonable and ordinary care? A. He was.

"Q. 11. Did the plaintiff receive the injury and was it occasioned by the negligence and the want of ordinary care on the part of the defendant company ? A. It was caused by a defective maul and material.

"Q. 12. In what did the said negligence consist? A. In neglecting to furnish the tools promised.

"Q. 13. Was the defendant guilty of a want of ordinary care toward the plaintiff in not furnishing him, as one of the employés, a reasonably safe and suitable tool to work with ? A. The evidence shows that the company was rather dilatory in supplying the tools promised.

"Q. 14. Whose special duty was it, if anyone's, to inspect the working tools of said section 5, from time to time, and report their condition to the company? A. The foreman's.

"Q. 15. Had the said foreman's attention been called specially, before the alleged injury occurred, to the condition of all the spike-mauls in his charge in use by the men under him at work on that section? A. It had.

"Q. 16. Had the company promised, prior to the time of the alleged injury, to replace and furnish new or reasonably safe and suitable tools or mauls to the foreman, for his men to work with? A. The foreman has so said.

"Q. 17. Did the company fulfill its said promise prior to or at the time of the alleged injury? A. They did not.

"Q. 18. Did the plaintiff resume work before he had been entirely cured of his injuries? A. He did.

"Q. 19. Did he do so upon the advice of a competent physician, and in good faith? A. He probably relied on statements of the hospital surgeon.

"Q. 20. Was the alleged injury produced by violence, or disease? A. By violence.

"Q. 21. Did the plaintiff, Sadler, before he began work with the maul on the day he was injured, inform the foreman that he was inexperienced in the use of a spike-maul, and ask to be excused, or set to work at something else? A. He did.

"Q. 22. Before Sadler began to work with said spike-maul and spikes, did the foreman either give him instructions how to set the spikes or use the maul, so as to avoid injury therefrom? A. He did not.

SPECIAL QUESTIONS ANSWERED FOR DEFENDANT.

"*Ques. 1:* Was not the plaintiff, at the time he was injured, employed by the defendant railroad company as a section hand? *Ans.:* Yes.

"Q. 2. Was not a part of the duties of plaintiff's employment, the time he was injured, the taking up of old rails and laying down of new rails in defendant's railroad track? A. Yes.

"Q. 3. Was not a part of plaintiff's duties, at the time he was injured, to spike down new rails laid in defendant's railroad track by driving spikes about five inches long to hold the rails to the cross-ties, and in so driving them to use a maul for that purpose? A. Yes.

"Q. 4. How long had plaintiff been in the employ of defendant as a section hand at the time he was injured? A. About two months.

"Q. 5. Did not plaintiff know that in performing the labor for which he was hired that he would be required and was required to spike down rails in the track, by the use of old spikes that were rusty and greasy? A. There is no evidence that he knew it.

"Q. 6. Did not the plaintiff know at the time he was hurt that the spike he was attempting to drive was an old, rusty and greasy spike? A. Yes.

"Q. 7. If you answer the last question in the negative, state what if anything there was to prevent plaintiff from knowing that fact if he had looked? A. ———.

"Q. 8. Did plaintiff know at any time prior to the accident that the maul which he was using was defective, on account of having been worn around on the edges, and on account of having a small piece chipped out of the face of the maul? A. Yes.

"Q. 9. Had the plaintiff been using the maul which he was using at the time he was hurt about an hour in the forenoon of the same day and after dinner until the time he was injured toward evening? A. We infer from the evidence he did.

"Q. 10. If the plaintiff at any time during the day on which he was hurt while he was spiking down rails, or at any other time, had looked at the surface of the maul, could he not have seen the condition of the surface of the maul which he was using? A. Yes.

"Q. 11. If you answer the last question in the negative, state what would have prevented the plaintiff from seeing the condition of the face of the maul, if he at any time had looked during the day on which he was hurt. A. ———.

"Q. 12. How many mauls for the driving of spikes were there at the place where plaintiff was working at the time he was injured? A. About eight.

"Q. 13. How many of said mauls were in use at that time? A. Four.

"Q. 14. Did plaintiff at any time complain to his foreman, or anyone else, as to the condition of the maul he was using or any of the tools which he had been using prior to the accident? A. No.

"Q. 15. If your answer to the last question is in the affirmative, state when he made such complaint, to whom he made it, and what was said by him. A. ———.

"Q. 16. Did the plaintiff's foreman or anyone representing the company at any time prior to the plaintiff's injury induce him to remain in the employ of the company by promising to

furnish him different or better mauls than those which were then furnished for the work on which plaintiff was engaged? A. The foreman did not promise Sadler individually, but did promise the section gang that he would in a short time furnish better tools.

"Q. 17. If you answer the last question in the affirmative, state when such promise was made, by whom it was made, and give the language used. A. ———.

"Q. 18. Is it not a fact that in spiking down railroad rails and using old, rusty and greasy spikes, similar to the spikes which plaintiff was using at the time he was hurt, it is a frequent occurrence that such spikes will fly when struck with a maul? A. Yes.

"Q. 19. State whether at any time prior to plaintiff's injury he made any complaint to his foreman or anyone representing the company on account of being required to use old, rusty and greasy spikes in fixing the track, and if so, state fully when such complaint was made, and to whom. A. No.

"Q. 20. State whether the plaintiff was induced to continue his employment and to continue the use of old, rusty and greasy spikes by any promise that he would be furnished different spikes to work with, and if so, state when such promise was made, and by whom, giving the language used. A. No."

Verdict for plaintiff, for $400; new trial denied, and judgment for plaintiff. The defendant *Company* brings the case to this court.

*George R. Peck, A. A. Hurd,* and *J. G. Egan,* for plaintiff in error.

*A. Smith Devenney,* for defendant in error.

Opinion by SIMPSON, C.: The material facts as found by the jury in answer to special interrogatories submitted by both parties, and from the evidence, are as follows: William Sadler, a young man, on the 31st day of March, 1885, was employed by the Atchison, Topeka & Santa Fé Railroad Company as a section hand on section No. 5, in Johnson county, at the rate of $1.10 per day. He was employed by the foreman, who had authority from the company to employ and discharge section-men, and he worked under the authority and direc-

tion of such foreman.  Sadler continued in the employment of the company until sometime in the month of June, when he was ordered by the foreman to use the spike-maul and drive spikes.  Sadler objected to this class of work, and informed the foreman of his inexperience, but he was compelled to work with the spike-maul for more than an hour on that day, and on the next day he worked an hour in the forenoon and until about four o'clock in the afternoon, when a spike flew from under the maul when it struck the spike, and struck Sadler on the left leg, cut the flesh, and fractured the bone; the wound bled profusely, and produced much pain.  Two weeks before this time, Burkett and Ball, two of the sectionmen, in the presence of Sadler had complained to the foreman of the defective and unsafe condition of the tool, and the foreman told them that the company had promised him new tools for the section, but that they had not come yet.  The section gang were engaged in taking up old rails and replacing them with new ones, and the old spikes were used in fastening the new rails.  The spike-maul used by Sadler was an old one, worn on the face, and at one side of the face were "chipped" pieces or a piece broken out.  The spike was an old and greasy iron one, about five inches in length, with about a half-inch bent at the top, and very rusty.  Sadler struck the spike with the maul, and the spike flew from under the blow and struck him on the leg.  When he commenced to work he looked for a moment at the maul, when the foreman called out to him in a loud voice, "Hurry up; everything is all right," and he immediately went to work.  Immediately after the injury Sadler's attention was called to the condition of the maul by Burkett, a fellow-workman, and they examined it and found that it was not only worn out, but was badly rounded and chipped off from the face.  He worked for two days after the injury, driving spikes, and thinking the injury was not serious, when the swelling of the limb and the pain compelled him to quit, and place himself in the charge of a physician.

Sadler testified at the trial that he had attempted to examine the maul before he went to work with it; that he "took

it up in this shape" (illustrating), and was looking at it; that he saw the edge was a little rounding, when the foreman hallooed out to "Hurry up; everything is all right;" that he then went on without further examination; that it was the same maul which he had used in the forenoon, and used in the afternoon from ten o'clock until he was injured, "along in the evening." The jury in answer to a special interrogatory, found that the plaintiff below knew prior to the accident that the maul which he was using was defective, on account of having been worn around the edges, and on account of having a small piece chipped out of the face of the maul. They also found that the plaintiff below knew at the time he was hurt that the spike he was attempting to drive was old, rusty, and greasy. There is no complaint or allegation in the petition of the defendant in error that the injury was occasioned by the defective condition of the spike. He bases his right to damages, upon the defective condition of the maul. There were eight mauls among the tools which were for the use of this gang of section-men; and the jury found that there were four mauls in use at the time the injury occurred. The findings of the jury may be formulated as follows:

First: The foreman knew that the maul used by Sadler was defective.

Second: The foreman had promised the section gang in the presence and hearing of Sadler to furnish new and perfect mauls.

Third: Sadler attempted to examine the maul before he used it, but was commanded by the foreman to "Hurry up; everything was all right."

Fourth: Sadler was inexperienced in the use of a maul, and in driving spikes, and so informed the foreman before he commenced to use the maul.

Fifth: The foreman gave him no instructions as to its use, so as to prevent injury.

Sixth: Sadler was not guilty of any fault, negligence or want of ordinary care contributing to the injury.

Seventh: The railroad company was guilty of negligence and want of ordinary care in furnishing defective tools and compelling their use.

This case was tried by a jury, with great skill and ability on both sides, and every possible question that could be raised on the state of facts is presented in this record. We want to say in a general way, that we are impressed with the unusual fairness of the trial for a case of this character. The general instructions of the court, and the general verdict of the jury, as well as their answers to the special interrogatories submitted by both sides, are all characterized by an absence of passion and prejudice, and a liberal regard for the rights of all, so much to be desired in judicial investigation. We shall not disturb a verdict arrived at by such means, unless there are such grave and material errors as absolutely compel a reversal.

1. Reversal; errors must be grave and material.

The counsel for the plaintiff in error complain of the admission of the testimony of Burkett; and they say that he was permitted to give his opinion that the spike-maul in use on the section at the time of the accident to Sadler was unsafe. They also complain that the same testimony was given by the witness Weber, over their objection. Both of these witnesses belonged to the section gang; they both testified that they had worked with the mauls; they both described the condition of the maul used by Sadler at the time of the injury, describing its defects, and stating that it was unsafe. We can see no objection to this. If it was expert evidence, the witnesses had qualified themselves for the expression of opinion. They stated to the jury the actual condition of the maul, and on their statement the ordinary, common knowledge of the jury would authorize the conclusion that the maul was unsafe. The testimony of the witness Burkett, that he told the foreman that the tools were unsafe, was admissible for the purpose of proving the knowledge of the company of the defective condition of the maul, if for no other purpose. This was one of the material facts which the plaintiff had to establish, and it could be brought to the knowledge of the company in that manner. We see no objection to it. There is no doubt on the evidence but that the company knew that the maul was defective, and through the foreman had promised

to furnish the gang new tools.   This promise was made in the presence and hearing of Sadler; and we think he had a right to rely on it under the particular circumstances of the case.

2. Defective tools; new ones, promised; injured employe; recovery.

He would certainly be bound by any general orders or directions given by the foreman to the gang of men with whom he was associated in work on the section. ( *U. P. Rly. Co. v. Fray*, 31 Kas. 739.)   And he ought to have the benefit of any promise made by the foreman to the men with whom he was associated. ( 2 Thompson on Negligence, 1017; *Perry v. Ricketts*, 55 Ill. 234; *Parody v. C. M. & St. P. Rly. Co.*, 15 Fed. Rep. 205.) A sufficient time had elapsed since the attention of the foreman had been called to the defective condition of the mauls in use on the section, for the company to furnish new and perfect tools when this injury occurred; and no attempt is made to explain the delay, or to show that any steps had been taken to replace the mauls.   After the defects of the tools have been called to the attention of the company, and a reasonable time has expired within which the company ought to have furnished new or perfect tools, their continued use is gross negligence. ( 55 Ill. 234.)

It is highly probable that some of the instructions are subject to criticism, but taking them all together they so fairly present the questions raised on both sides, that it is almost impossible that the jury could be misled by them to the prejudice of the plaintiff in error.   Taking all the circumstances and facts of the case into consideration, the inexperience of the defendant in error in this particular line of work; his notice to the foreman in that respect; the fact that he was required to work with a defective tool; that he had no sufficient opportunity to examine it; that his attempt to do so was interrupted by the foreman by a command to "Hurry up," coupled with an assurance that "everything was all right;" the neglect of the company for more than a reasonable length of time to, furnish new tools, after repeated warnings that those in use were defective; the freedom of the jury from passion or prejudice; the evident desire of the court to fully and fairly

instruct on all material questions; the verdict of the jury and its approval by the trial court on the motion for a new trial, we are disposed to think that substantial justice has been done, and no error committed that ought in the interests of justice and the due administration of the law to compel a new trial.

It is recommended that the judgment be affirmed.

By the Court: It is so ordered.

All the Justices concurring.