INDUSTRIAL LUMBER COMPANY V. DANIEL JOHNSON.

Decided February 14, 1900.

1. **Master and Servant—Dangerous Machinery—Complaint by Servant—Promise to Repair—Assumption of Risk.**

The servant having knowledge of dangerous defects in the machinery may relieve himself of the risk by bringing the facts to the knowledge of the master and receiving such assurances as to show an express assumption of the risk by the master, or afford the servant reasonable guaranty that the danger will be removed in time to prevent injury to him.

2. **Same.**

A servant having knowledge of a defective drawhead on a car he was required to operate, called it to the attention of the master, who promised to repair it,—the complaint not being on the ground of danger in its use, but of its insufficiency for its work; thereafter the servant, continuing to use it with knowledge that it had not been repaired, was injured through its defects. Held, that the risk was assumed by the servant, and he could not recover.

3. **Same.**

The servant's complaint and the master's undertaking to repair being to facilitate the transaction of the master's business, and not for the protection of the servant, there could be no assumption of the risk by the master.

4. **Practice on Appeal—Rendering Judgment.**

Where the appellate court reverses a judgment for plaintiff because the facts require a verdict for defendant, and the facts appear to have been fully developed, it is proper to render judgment accordingly, instead of remanding.

APPEAL from Newton. Tried below before Hon. STEPHEN P. WEST.

*Ford & Crawford,* for appellant.

*W. L. Douglass* and *Votaw & Martin,* for appellee.

KEY, ASSOCIATE JUSTICE.—In November, 1898, appellant was engaged in operating a railroad, in connection with his lumber business, and appellee was employed by it in connection with the operation of one of its trains. He acted in the capacity of conductor, fireman, and brakeman; and on the 24th day of said month, while attempting to uncouple cars on the train under his control, his thumb was mashed by a coupling pin, which he was attempting to pull out of the drawhead. For the injury thus sustained, appellee brought this action, and from a judgment in his favor, appellant has appealed.

The drawhead was defective, unsafe, and needed repairing; and appellee's thumb was caught between it and the pin and injured.

The testimony supports the finding that appellant was guilty of negligence in not repairing the drawhead; but the undisputed testimony, coming from appellee himself, shows that he had knowledge, long before and at the time of his injury, of the defects in the drawhead; and having such knowledge, and consequently knowing that the use of the drawhead in that condition would necessarily involve the risk of such an injury as resulted, he must be held to have assumed such risk when

he continued to use the appliances in that condition, unless he brings himself within the exception to the general rule, by showing a promise by the master to repair the defective appliances. This he alleged in his petition and attempted to establish by testimony. The strongest testimony on that subject is that given by himself, which is as follows:

"Ten or twelve days before I got hurt we had a wreck and went to couple the engine onto the derailed cars, and Mr. Adams objected to us making the pull because it would pull the drawhead clear through, and I said I hoped so, then you will have it fixed; and Mr. Adams said, 'Lintz, I want you to fix that thing right away,' and I remarked 'that it ought to be made out of oak,' and Adams said that 'pine was as good;' and Lintz said 'that he would take the measure and fix it right away;' and that was ten or twelve days before I got my hand mashed. Lintz took the measure with a rule, and I said, 'Look up there, Mr. Lintz, and see how the beams are shaped.' Adams, Singletary, and Lintz were all there. He, Lintz, told me he was going to fix it right away. I had been working there, but it was getting worse and worse all the time. They said they were going to fix it, and I went to work relying on it. Lintz said he would fix it right away. * * * I called attention to the defect in the drawhead, because Adams objected to my pulling with it. He said 'it will pull it clear into;' and I said 'that is just what I want to do, because you will fix it then.' We had a wreck there on Saturday and this was on Sunday when we were trying to put the cars back, and Mr. Adams was afraid we would pull the drawhead out. He had reference to the weakness of the thing, and was afraid it would cause delay there, if we undertook to pull. It struck me that it was the first time he knew it was out of fix. He did not want us to pull the cars up out of the ditch, because it might pull the drawhead out. I knew it could not pull it out, because the draft was on the other end. I did not explain to Mr. Adams what I knew about it. I commenced working for the company about the 12th of September, and the wreck was about the 10th or 12th of November. The drawhead had been in bad condition all that time and getting worse. That was the only time I ever called anybody's attention that I have any recollection of. * * * At the time when my thumb was mashed, I knew the exact condition of that drawhead, and its effect on the coupling. There was nothing concealed about it. I knew it was in a bad fix. It was getting worse every day. * * * I did go to work, but I had their promise to fix it. I knew that they had not fixed it, and I worked from Monday till Thursday after they had promised to fix it. We cleaned up the wreck on Sunday, and that night I took a chill and on Monday week following I went back to work again, and on Thursday I got hurt. I went to work again on Monday with that engine with Mr. Gee, coupling cars. I was fireman and brakeman on that train. I knew every day that I went to work that the drawhead had not been fixed, but was in the same condition, and continued to use

it. The defect was open and patent to my observation. I knew it was broken, or I would not have said anything about it."

Adams, who represented appellant, and directed Lintz to repair the drawhead, testified that he did so because he was afraid it would pull out, and that he heard no complaint about it being dangerous.

This testimony (and there is no other in the record more favorable to appellee) falls short of such promise to repair as would relieve a servant from the assumption of risk resulting from continued use of appliances known by the servant to be defective and dangerous.

In this case, like Railway v. Turner, 3 Texas Civil Appeals, 487, the servant did not complain to the master on account of any danger to him from the continued use of the appliances in their defective condition; and the instructions given by the master to another employe to repair the drawhead, were intended to facilitate the transaction of the master's business, and not for the protection of the servant.

In the case cited, Turner complained to the trainmaster about the want of a fireman on the engine, telling him that he could not do the work with one man to handle the engine without any fireman or assistant, and the trainmaster replied, "I will see to getting you a fireman at once." Turner was master of the railroad's yards at Willis; and thereafter, while attempting to uncouple cars in the yard, he received injuries resulting in his death; and the testimony tended to show that had there been a fireman on the engine Turner would not have been injured:

The Galveston Court of Civil Appeals held that the railway company was not liable. Associate Justice Williams, in the course of the opinion, used this language: "There was no complaint by Turner of a deficiency in the force of employes, exposing him to danger. There was no promise on the part of the master to remedy any such condition for the protection of the servants. The subject of discussion was delay in moving trains, and the complaint came from the master. The deficiency in the force was referred to as an excuse for that, and what the master said was not an assurance given to the servant to induce him to remain in the service, but was addressed to the advancement of his own business. When the servant knows of defective appliances or dangerous conditions surrounding the service, he has the option of taking upon himself the risk of continuing in the employment, or of quitting. He may relieve himself of the risk, if he brings the facts to the knowledge of the master and receives such promises or assurances as either to show an express assumption of the risk by the master or to afford the servant reasonable guaranty that the danger will be removed in time to prevent injury to him. To have either of these effects, it would seem that what has passed between them should appear to have had in view either a transfer of the risk from the servant to the master or the removal of the dangerous condition as a protection to the servant. In other words, the master should have induced the servant to waive his right to leave the dangerous employment, either by

taking upon himself the responsibility for injuries which might result, or by leading the servant to believe that the duty to repair the appliances or supply the deficiency would be performed within reasonable time. The facts here do not show that either of these things was done. Turner neither complained of his own risks nor asked for protection. He said nothing calling in question the master's duty to himself. While a promise was made to furnish a fireman, it was to be done in order to forward the master's business, and not as a discharge of a duty or measure of protection to the employes. The master having made the statement expressly for his own benefit, could change his mind about furnishing the fireman without violating any obligation assumed to Turner."

We think this case falls clearly within the principle announced in the Turner case, which commends itself to our judgment as correct.

The case appears to have been fully developed, and as there is no probability that it can be strengthened in the respect referred to, we see no reason why it should be remanded for another trial. Therefore the judgment of the District Court will be set aside and judgment here rendered in favor of appellant, that appellee take nothing and pay the costs of both courts.

*Reversed and rendered.*

Writ of error refused.