THE ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY v. JOSEPH MEALMAN.

No. 15,629.　(97 Pac. 381.)

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Injury to Employee—Assumption of Risk.* An employee of a railroad company, by continuing to use a defective appliance with full knowledge of its condition, thereby waives the right to recover for an injury caused by such defect, and assumes the risk incident thereto.

2. ——— *Promise to Repair Defective Appliance.* An employee who has waived the right to recover for an injury caused by a defect in an appliance and assumed the risk, as above stated, will be relieved from such responsibility if he requests the company to repair the defect and receives a promise that the requested repairs will be made, and, because of such promise, remains in such employment.

3. ——— *Same.* Before such a request and promise will relieve an employee of the assumption of risk, the request must be made for the purpose of securing protection by the employee from apprehended danger to himself, and his continuance in the employment thereafter with the defective appliance must be induced by the promise to repair.

4. RAILROADS—*Defective Appliances—Assumption of Risk by Injured Employee.* The plaintiff was a section-hand in the employment of a railroad company. With other employees he used a hand-car that had brakes which were so worn and defective as to be practically useless. This defective condition continued for more than two weeks. It was open to ordinary observation, and for this period was well known to the plaintiff. The plaintiff spoke to the foreman about the defect and told him it ought to be repaired. The foreman stated that he intended to repair it, but they would use it without the repairs for the present. At this time the plaintiff did not regard the defect as dangerous, and his only purpose in calling the fore-

man's attention to it was that, if repaired, the car could be handled more conveniently in their work. Some days afterward the plaintiff was thrown from the car and injured. The injury was due to the defective brakes. *Held*, that the plaintiff waived the defect and assumed the risk, and the railroad company is not liable in an action for damages for such injuries.

Error from Linn district court; WALTER L. SIMONS, judge. Opinion filed July 3, 1908. Reversed.

*W. F. Evans,* and *R. R. Vermilion,* for plaintiff in error.

*A. M. Keene,* and *E. C. Gates,* for defendant in error.

The opinion of the court was delivered by

GRAVES, J.: Joseph Mealman was employed by the St. Louis & San Francisco Railroad Company as a section-hand. On August 17, 1905, Mealman, while engaged in the duties of his employment, was thrown from a hand-car and injured. He afterward commenced this action in the district court of Linn county and recovered a judgment for the sum of $2000. The railroad company brings the case here for review.

Several assignments of error have been presented, but, in the view we have taken, only one need be considered. To obtain a clear understanding of this point it will be necessary to consider the following facts: The negligence charged against the railroad company is its failure to keep in repair the brakes on the hand-car from which Mealman was thrown. These brakes had been out of repair several weeks, and were so defective as to be practically worthless. Mealman had been using the car, in company with other employees, for about two weeks before the injury, during all of which time he knew of its defective condition. A few days before he was injured he called the attention of the foreman to the condition of the brakes, and stated that they ought to be repaired. The foreman replied that he in-

.32—78 KAN.

tended to repair them, but would continue to use them as they were for a while.

Upon these facts the railroad company claims that where an employee, without complaint, continues to work with a defective appliance, having full knowledge of its imperfect condition, he will be deemed to have waived the right to recover for an injury caused by the defect and to have assumed the risk incident thereto. This is conceded by both parties to be the law. To avoid the effect of this settled legal rule Mealman insists that where an employee, having knowledge of a defective appliance, calls the attention of his superior officer to the defect and requests that it be repaired, and receives a promise that the repair will be made, and the employee continues to work with the defective appliance relying upon the expectation that the promise will be fulfilled within a reasonable time, then he does not waive the defect nor assume the risk, but is entitled to the same immunity from danger that he would enjoy if the defective appliance were in perfect condition. And this is likewise conceded to be the law.

Finally the railroad company stands upon the proposition that Mealman has not shown a state of facts which relieves him from the assumption of risk, and this raises the question upon which this case depends. The facts bearing upon this question are as follow: On the trial the jury returned special findings of fact which read:

"(1) Ques. Was the brake on the hand-car in question defective and insufficient at the time of the injury to plaintiff complained of? Ans. Yes.

"(2) Q. How long had the brake on the hand-car been defective and insufficient, as shown by the evidence, at the time of the injury to the plaintiff complained of? A. About two weeks.

"(3) Q. How long prior to the injury had plaintiff been using the hand-car in question? A. About two weeks.

"(4) Q. Did plaintiff at the time of the injury com-

plained of know that the brake on the hand-car was defective and insufficient? A. Yes.

"(5) Q. How long prior to the injury had plaintiff known that the brake on the hand-car was defective and insufficient? A. About two weeks.

"(6) Q. Did plaintiff, knowing the defective and insufficient condition of the brake, continue to use and ride on the hand-car in performing the duties of his employment by defendant? A. Yes.

"(7) Q. How old was plaintiff at the time of the happening of the injury complained of? A. Thirty-six years.

"(8) Q. Was plaintiff at the time of the injury, and during the time he was using and riding on the hand-car, a man of ordinary intelligence? A. Yes.

"(9) Q. At the time of the happening of the injury complained of, how long had plaintiff been engaged in the work of a railroad section-man? A. About six weeks.

"(10) Q. At the time of the happening of the injury complained of, how long had plaintiff been engaged in using and riding hand-cars on the section when the injury occurred? A. About six weeks.

"(11) Q. On what act of negligence on the defendant's part do you base a verdict for the plaintiff? A. Defective brakes."

These findings show that Mealman remained in the service of the company with full knowledge of the defect of which he complains. The only evidence upon the subject of his request to have the defect repaired, and the promise made to him by the foreman, consists of the testimony of Mealman himself, which reads:

"Ques. What did you say to Cassady? Ans. Why, I told him the brakes were out of fix and needed fixing.

"Q. What else did you say to him at that time about the condition of the brakes, if anything? A. Why, there was n't nothing. . . . It was just a talk about the brakes being out of order and needed leather there, rubber or something.

"Q. That is what you said to him, is it? A. Yes, sir. . . . He said go ahead and use it and he would fix it.

"Q. What did he say? A. Why, he said he would fix it. . . . He said go ahead and use it.

Railroad Co. v. Mealman.

"Q. I will ask whether or not you relied upon that statement of his at the time you were injured? A. Yes, sir.

"Q. You say you talked with Cassady about the car being out of repair, do you? A. Yes, sir.

"Q. Tell the jury just exactly what you said to him at that time. A. I said to him the brakes was out of order and needed to be fixed, and he said he would—

"Q. Tell the jury the words you used when you talked to Cassady about these brakes. A. The way it was, we were running north from town or the toolhouse out to where we stopped along the right of way to take water—where we stopped to go over in the field to get water. There was four on the car that went out, besides Mr. Cassady, that morning, two or three mornings before I was hurt, and a couple of them went over to get a keg of water, and we were standing there by the car, and we had run by the crossing that morning. Ed Cassady was present at the conversation. One of the other men was out a little piece around on the tracks.

"Q. Tell the words used in speaking to Cassady on that occasion about that car. A. We run by there and I said, 'This brake ought to be fixed;' I said, 'It needs a rubber on it.' We pushed the car back a piece and went to get the water; while they were gone the conversation came up. I said to Ed, 'We will have to fix the brakes—you will have to.' He said, 'All right, I will fix it.'

"Q. State over again what you said to him. A. I said to him, 'The brakes need fixing,' and he said he would fix them.

"Q. State again so the jury will understand just what you said. A. I said to Ed that the brakes needed fixing, and he said he would fix them.

"Q. You said a minute ago you said, 'These brakes are out of order and we will have to fix them.' Didn't you use that expression? A. I don't know. Maybe I did."

"Q. Did you think it was dangerous to ride on that car in that way? A. No, sir; I didn't.

"Q. Why wasn't it dangerous? A. I never had thought of it being dangerous, just the brake being out of order, any more than just at that time.

"Q. You did not consider then it was dangerous in the condition it was in? You did not realize it was? A. No, sir.

"Q. Why did you speak of it to him? A. Because it was unhandy to stop at this place where we wanted to work; if we wanted to stop to put any bolts in going along we would run along on by and would have to walk back.

"Q. It was more, then, a matter of convenience? A. Yes, sir.

"Q. It was not because you regarded it dangerous to ride on that car? A. I did n't at the present time; no, sir.

"Q. Did you not say anything to Cassady about it being dangerous? A. No.

"Q. You did n't say anything to Cassady about it being dangerous, did you? A. No, sir.

"Q. When you told Cassady that brake was out of repair and ought to be fixed, did you intend to quit work in case he did not fix it? A. I never thought anything as to whether I would or would not."

The rule of law as to the character and purpose of such a request and promise is clearly stated in volume 26 of the Cyclopedia of Law and Procedure, at page 1211, where the cases supporting the rule are noted. The rule reads:

"To be sufficient, a promise by the master to remedy defects or remove danger must be definite and certain, and must be made with a view to the servant's safety, and as an inducement to him to continue work. The promise may, however, be implied as well as express, general as well as individual. . . . In order that a servant may be relieved from the operation of the doctrine of assumed risk from a defect complained of and the danger of which he was no longer willing to incur, it is essential that his remaining in the employment was induced by the promise of the master to remedy the defect, when he would not otherwise have done so; and where the reliance is placed, not upon the promise, but upon an assurance of absence of danger, he can not recover."

In the case of *Gowen v. Harley,* 56 Fed. 973, 6 C. C. A. 190, it was said by the circuit court of appeals:

"If a servant who is aware of a defect in the instruments with which he is furnished notifies the master of such defect, and is induced, by the promise of the latter

to remedy it, to remain in the service, he does not thereafter assume the risk from such defect until after the master has had a reasonable time to repair it, unless the defect renders the service so imminently dangerous that no prudent person would continue in it. *Hough v. Railway Co.*, 100 U. S. 213, 225, 25 L. Ed. 612; *Railroad Co. v. Young*, 49 Fed. 723, 1 C. C. A. 428; *Greene v. Railway Co.*, 31 Minn. 248, 17 N. W. 378, 47 Am. Rep. 785; *Railway Co. v. Watson*, 114 Ind. 20, 27, 14 N. E. 721, and 15 N. E. 824, 5 Am. St. Rep. 578." (Page 981.)

And further in the same opinion it was said:

"It is insisted by plaintiff's counsel that he can escape from this rule under the exception we have stated—that where a servant is aware of a defect in the machinery furnished, and notifies the master of it, and he is induced, by the promise of the master to repair it, to remain in the service, he no longer assumes the danger. The reason on which this exception stands is that, where the servant may have been induced, by the promise of his master to remedy a defect, to expose himself to risks from it that he might otherwise have avoided by leaving the service, the master ought not to be permitted to deny his sole responsibility for those risks. The case before us does not fall either within the exception or its reason:

"First: Because the plaintiff apprehended no risk or danger from the want of the skid, and hence could not have been induced to stay in the service, and expose himself to danger, by the promises of the defendant to furnish it. He testifies that the only reason he asked for it was because he thought it would be easier for him to slide the safe and train box over on it than to swing them across from one car to the other. He expressly says that he never before the accident thought of its being dangerous to swing them over, and that he did not regard it as at all dangerous to do so." (56 Fed. 982.)

In the case of *Lewis v. New York, &c. Railroad,* 153 Mass. 73, 26 N. E. 431, 10 L. R. A. 513, the supreme court of Massachusetts recited the evidence at some length, wherein it appeared that the employee had frequently called the attention of his foreman to the dan-

gerous condition of the pier of a drawbridge and in-
.sisted that it should be repaired or somebody would get
hurt, and some persons had already been injured. The
question was then put to the plaintiff whether he had
complained of its dangerous condition as it affected
himself, and he answered as follows:

"Well, I complained of it a number of times to him.
I told him somebody is going to get hurt yet; there is
a number fell through, and the day before I got hurt
there was one of the carpenters   .   .   .   fell through
.   .   .   chock up to his hip." (Page 76.)

In this connection the court said:

"It is noticeable that nowhere in this conversation
nor in his answers does the plaintiff say or imply that
his continuance in the service was due to what Bent
said in regard to the repair of the pier; and it would
be giving to the conversation between the plaintiff and
the superintendent a construction which we think
neither intended or had in mind to hold that the plain-
tiff was induced to remain in the defendant's employ
by what the superintendent said about repairing the
pier, or that the superintendent with that end in view
gave the answers which he did.

"The plaintiff seems to have called the attention of
the superintendent to the condition of the pier, and to
have urged its repair, not on his own account, nor be-
cause the discharge of his duties was rendered more
dangerous, nor because he had any intention of leaving
if the pier was not repaired. But he seems to have
acted in the interests of the company, and in order to
prevent strangers and others coming onto the pier, and,
not knowing where to go, from getting hurt.   .   .   .
No case, we think, has gone so far as to hold that where
the servant does not complain on his own account, and
continues in his employment with full knowledge of
the risk, he can recover of the master because the
latter, when the defective condition was called to his
attention by the servant, gave assurances, which did
not induce the servant to remain, that the defect should
be remedied." (Pages 76, 77.)

This case was followed in the case of *Bodwell v.
Nashua Mfg. Co.*, 70 N. H. 390, 47 Atl. 613. In the
case of *Lumber Co. v. Johnson*, 22 Tex. Civ. App. 596,

55 S. W. 362, where the evidence was quite similar to that in the case of *Lewis v. New York, &c. Railroad, supra,* the Texas court of civil appeals said:

"When the servant knows of defective appliances or dangerous conditions surrounding the service, he has the option of taking upon himself the risk of continuing in the employment or of quitting. He may relieve himself of the risk, if he brings the facts to the knowledge of the master and receives such promises or assurances as either to show an express assumption of the risk by the master or to afford the servant reasonable guaranty that the danger will be removed in time to prevent injury to him. To have either of these effects, it would seem that what has passed between them should appear to have had in view either a transfer of the risk from the servant to the master or the removal of the dangerous condition as a protection to the servant. In other words, the master should have induced the servant to waive his right to leave the dangerous employment, either by taking upon himself the responsibility for injuries which might result or by leading the servant to believe that the duty to repair the appliances or supply the deficiency would be performed within reasonable time. The facts here do not show that either of these things was done. Turner neither complained of his own risks nor asked for protection. He said nothing calling in question the master's duty to himself." (Page 598.)

These constitute a very small part of the multitude of cases holding to the same view, while our attention has not been called to any case holding to the contrary.

Mealman did not regard the defect as dangerous. He did not suggest the repair of the brakes as a precaution for his own safety. He had no thought of leaving the employment if the suggested repairs were not made. Whether the repairs were made or not was a matter of indifference to him, except as a matter of convenience in handling the car. The reliance, if any, which he placed on the promise to repair was not the cause which induced him to remain in the service of the company. He did not continue in the employment of the company because of anything relating to these

brakes. It did not enter his mind to quit the service. There was no occasion for him to do so, as he did not regard the employment as dangerous. It seems clear, therefore, that the plaintiff assumed the risk incident to the defective brakes, and took no steps to relieve himself from such responsibility. No other conclusion can be reached without ignoring the plaintiff's own testimony and disregarding the well-settled rules of law controlling such cases.

This disposes of the case, so that the other questions presented need not be considered. The judgment of the district court is reversed, with directions to proceed in accordance with the views herein expressed.