No. 18,591.

J. W. ANDERS, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. SPECIAL FINDINGS—*Evasive and Contrary to the Evidence.* The rule that the returning by the jury of an answer clearly evasive or contrary to the evidence is misconduct, followed.

2. DEFECTIVE COAL OIL—*Complaint of Brakeman—Promise to Repair.* A complaint by a brakeman to the proper agent of his employer of a defective instrumentality may be either express or implied, as may also be a promise to remedy, and when there is presented a situation including a report of a defect and a response thereto by such agent, the significance of which situation, report and response might be differently interpreted by fair-minded men, it is for the jury to say what meaning should be given to such report and response.

3. SAME—*Promise to Repair—Inducement to Remain.* The rule that the promise to repair must be the inducement to remain in the service means that such promise is deemed by the law to imply an agreement by the employer that until the defect is remedied or the lapse of a reasonable time therefor he instead of the employee will assume the hazard arising from the defect.

Anders v. Railway Co.

4. SAME—*Poor Coal Oil—When Master is Guilty of Negligence.*
When a railroad company places in storage for the use of
its brakemen in their lanterns the best quality of oil that can
be purchased in the market it will not be liable for oil found
to be defective unless shown to have been guilty of negligence
after so placing such oil in storage, which negligence might
arise from failure within a reasonable time to replace with
good oil that which is actually found and reported bad.

5. SPECIAL FINDINGS—*Inconsistent with Each Other and with
General Verdict.* When in a case involving the alleged neg-
ligence of the employer in providing proper oil numerous
findings of fact are returned by the jury, some of which show
negligence and others proper care, the latter being not only
inconsistent with the former but with the general verdict, a
new trial should be granted.

Appeal from Shawnee district court, division No. 1;
ALSTON W. DANA, judge. Opinion filed January 10,
1914. Reversed.

*William R. Smith, Owen J. Wood,* and *Alfred A.
Scott,* all of Topeka, for the appellant.

*J. G. Waters, John C. Waters,* and *J. J. Schenck,* all
of Topeka, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff, a brakeman, recovered for
the loss of an arm, alleged to have been caused by the
negligence of the defendant in furnishing a poor quality
of oil for his lantern. Upon the first trial a demurrer
to the plaintiff's evidence was sustained, but upon
appeal it was held that he was entitled to go to the jury
upon the question whether the injury was occasioned
by the want of a better light. (*Anders v. Railway Co.,*
83 Kan. 218, 109 Pac. 773.) A second trial resulted in
a judgment which the defendant claims should be re-
versed for the reasons that the alleged bad oil was not
the proximate cause of the injury; that no promise was
made to the plaintiff to furnish him a better quality
and the risk of using what he had was assumed by

him; that the findings conclusively establish proper dili-gence on the part of the defendant to provide proper oil; that there was error in giving and refusing instruc-tions; that some of the findings are contrary to the undisputed evidence; and that a new trial should have been granted.

As to the first proposition, the jury determined that the quality of the oil was the cause of the injury, and it can not be said that this determination was entirely unsupported by the evidence. In connection with this branch of the case, however, the plaintiff testified that when he approached the obstruction he had time to have stopped and thrown it out of the way had he wanted to; that he had time but did not have much light.

"Q. And you had plenty of time to stop and look it over and see what it was and you did n't do it? You had plenty of time to pick it up and throw it out of the way if you wanted to, did n't you? A. I suppose I had time, yes, sir, but I did n't do it. . . .

"Q. You could have stopped and observed the thing, could n't you? You was n't hurried there at that time? A. No, sir; I was n't in no hurry.

"Q. You could have stopped right there and kicked the thing over and thrown it out of the way if you had wanted to; that he had time but did not have much light.

Question No. 32 with its answer is as follows:

"Q. If the plaintiff had stopped and made an exam-ination of the obstruction, could he have determined what it was—its size, nature and character—by the light he was using? A. If he had time."

Certain other answers are criticized, but they in-clude the element of opportunity as well as time to ob-serve the obstruction, and opportunity under the cir-cumstances involves the matter of sufficient light. But the answer to question No. 32 refers to a lack of time not shown by the plaintiff's own testimony, and the question was a proper one which entitled the defendant to an answer in accordance with the plaintiff's own un-disputed evidence.

It was testified and found that about four days before the injury the plaintiff stated to his conductor that there was something wrong with the oil, that it was poor stuff, and that he could not get his lamp to burn it, and he was told in reply that it had already been reported. The conductor was the proper agent of the company to receive such complaint. The jury were instructed that they might take into consideration the purpose of making such report, that it was the duty of the defendant to furnish a supply of reasonably good oil upon reasonable request and within a reasonable time thereafter, and if they believed that such report was to get good oil in place of bad and that the conductor's statement led the plaintiff reasonably to believe that proper oil would be supplied and was made by the conductor for that purpose, then they were to say as a matter of fact whether the plaintiff was guilty of contributory negligence in remaining at work with the oil he had. Instruction No. 19 was as follows:

"Before such a request and promise would relieve an employe of the assumption of risk, the request must be made for the purpose of securing protection by the employe from apprehended danger to himself, and his continuance in the employment thereafter with a defective instrumentality must be induced by the promise to remedy the defect."

It is urged that there was nothing shown from which it could fairly be said that any promise was made by the conductor, and hence the plaintiff could not have been induced thereby to remain at work; that in fact no request was made but a mere general complaint with no purpose of securing protection from apprehended danger. *Railroad Co. v. Mealman*, 78 Kan. 496, 97 Pac. 381, is cited. There the plaintiff testified that he had never thought of the defect as being dangerous, and hence it was held that he did not report it for the purpose of escaping a threatened danger. It was also laid down, as it has been by the courts generally, that

the promise to repair must have been the inducement to remain in the service. Here we have no statement as to how the defect was regarded or as to why the report was made or the response thereto. But a situation and a conversation were detailed and their significance was a fair matter for the jury to determine. Some might argue that a mere purposeless criticism of the oil was made and that the response meant only that the conductor felt like joining in such criticism. But it might also be contended that the brakeman, not caring unnecessarily to assume needless hazards, complained to the proper representative of the company, who, instead of promising to do his part towards bettering the condition, stated that he had already done that, leaving the complainant to take it for granted that the company would act with reasonable promptness upon the report already made. The jury appear to have taken the latter view and we can not say it was without justification. As to the rule that a promise to repair must be the inducement to remain, this is but another way of stating the legal effect of such promise. When a workman takes employment the law implies that he assumes the ordinary risks thereof. The law also makes it the duty of the employer to use proper care to furnish a reasonably safe place to work and reasonably safe instruments to work with. When the workman finds himself supplied with an improper instrument, the use of which increases the hazards of his employment, he may either refuse to work longer—a privilege regarded much more highly in former times than now—or he may request the employer to provide a proper instrument. If upon such request a promise so to do is made such promise is regarded by the law as an agreement on the part of the employer that until the promise is complied with or until reasonable time therefor he will assume the extra hazard and not expect his employee so to do, and hence, as said by this court in a former decision, "The employee has still a reasonable time

Anders v. Railway Co.

after the employer is in default before he is required to quit the service or assume the risk." (*A. T. & S. F. Rld. Co. v. Lannigan*, 56 Kan. 109, 115, 42 Pac. 343; see elaborate footnote to *Illinois Steel Co. v. Mann*, 170 Ill. 200, 48 N. E. 417, in 40 L. R. A. 781.) That the request and promise may be implied as well as express is supported by numerous authorities, the following being more or less in point: *A. T. & S. F. Rld. Co. v. Sadler*, 38 Kan. 128, 16 Pac. 46; *Lupher v. Railway Co.*, 86 Kan. 712, 122 Pac. 106, and cases cited; Labatt, Master and Servant, 1st ed., § 419; 2d ed., §§ 1345-1348; *Alkire v. Myers Lumber Co.*, 57 Wash. 300, 106 Pac. 915; *Stoutenburgh v. Dow, etc., Co.*, 82 Iowa, 179, 47 N. W. 1039; *Detroit Crude-Oil Co. v. Grable*, 94 Fed. 73.

It was testified without dispute that for fifteen years the company had supplied the best signal oil the market afforded, oil manufactured by a reputable firm, and that it had stood the tests made by the company; that this quality of oil was tested at the Topeka storehouse, and thence shipped out to division points, including Emporia; that a tank load was received at Topeka about January 1, 1907, a sample tested by the defendant's chief chemist, and after his acceptance placed in stock; that a tank was shipped to Emporia January 21, which was the last until after the occurrence of plaintiff's injury.

In addition to their general verdict the jury were asked to make seventy findings of fact. It was found that the signal oil used in the lanterns of the trainmen was purchased of a reputable and experienced manufacturer, who had been furnishing it for fifteen years, during which time it had stood the tests made by the defendant and had been accepted by it.

"Q. 45. Was the quality of the signal oil used by the defendant Company in its lanterns the best that could be purchased in the market? A. Yes.

"Q. 62. Was the oil with which the plaintiff Anders filled his lantern at Emporia shipped from Topeka to Emporia by the defendant Railway Company? A. Yes.

"Q. 63. If you answer the above question yes, then state whether the oil was inspected and tested as to its burning qualities by a chemist of the Railway at Topeka? A. Yes.

"Q. 41. Did the plaintiff procure the oil he was using on the night of the accident at Emporia, Kansas, about a week or ten days before the accident? A. Yes."

In the eleventh instruction the jury were told that if the company exercised reasonable and ordinary care in furnishing plaintiff such a quality of oil as to afford a reasonably clear and distinct light it would not be liable even though the oil actually used by him at the time of the injury was not of reasonably good quality. It is insisted that this was the proper criterion of liability and that the findings show not only ordinary but extraordinary care. If the foregoing findings were all the jury had made it is clear that under this instruction the defendant would be free from liability.

But the following answers were also returned:

"Q. 21. Did the lantern that the plaintiff was carrying go out when he was descending from the car, just before the accident? A. Yes.

"Q. 58. If you find that the oil in plaintiff's lantern was defective at the time of the accident, then state in what respect it was defective? A. Having a tendency to smoke chimney, crust wick, insufficient light and go out.

"Q. 46. If you find that the plaintiff's injury was caused by any negligence on the part of the Railway Company, please state fully in what such negligence consisted? A. Bad oil."

The plaintiff testified that some four days before the injury he told the conductor that there was something wrong with the oil. "I said, it is awful poor stuff, I can't get any light out of it. He said, it has already been reported. Q. Did he say how it had been reported? A. He says, I have already reported it, that is

the word he made." That on the night he reported to the conductor the latter told him that he himself had been having trouble with it that evening. "We talked about the oil being poor and how it was acting. Q. Was that before he said he had reported it? A. No, that was after he said he had reported it." The conductor denied having received any complaint from the plaintiff touching the oil used by the latter; denied telling him that the oil had been reported. On cross-examination he stated:

"If a man would make the declaration that the oil was bad and he could n't use it, I would give him a requisition for more oil. It was not my duty to see that good oil is had. It is the Company's duty to furnish good oil. The brakeman would report to me. If a brakeman has got bad oil and reports it to me it is the Company's duty to see that he gets good oil. I would notify the Company of the condition he told me of.

"Q. Then after he has reported to you what is your duty? A. I would make some inspection myself.

"Q. Suppose it was bad oil, what is it your duty to do? A. I would see how it burned for me, how it burned for other people. If he had oil that he could n't use I would return it to the storehouse and get new oil. I would get more oil. I could n't tell as to the kind."

The defendant's chief chemist stated on cross-examination that oil which would crust the wick so as to make a flame go below one inch in twelve hours, thus giving a poor light, would be an inferior oil which he would not pass. Instruction No. 12 was that if the oil furnished the plaintiff was not of such quality as to afford a reasonably clear and distinct light and he reported it as bad to the conductor, and he was the proper one to whom to make such report, it then became the duty of the defendant to exercise reasonable care in remedying the defect, and if it failed to do so within a reasonable time after it had notice or reasonably should have known of the defect it would be liable. This is complained of as being a departure

from the true rule given in the previous instruction, and as leaving the company liable notwithstanding it had for fifteen years exercised not only ordinary but extraordinary care to supply its employees with proper oil for their lanterns. But the two instructions appear simply to apply the rule of reasonable care, first, to the general task of supplying proper oil for use by the defendant's employees, and second, to a situation in which oil although drawn from the supply on hand is found and reported to be of bad quality. The evidence indicated proper and commendable care in the first instance, and unless having used due care to place good oil in storage the company was thereafter guilty of some negligence it would not be liable. If, however, oil afterwards taken from such supply on hand were actually found to be bad and so reported to the company then the rule embodied in the 12th instruction would obtain. But what do the findings mean? No. 45 is that the quality of oil—not placed or kept in storage, but used by the company in its lanterns—was the best that could be purchased in the market. This would certainly show due care respecting the plaintiff who was using one of the company's lanterns. Again, other findings show not only that first-class oil was sent to Emporia but that from it the plaintiff filled his lantern a week or ten days before the injury, and yet that this oil at the time of the injury was so bad as to have been the cause thereof, and that the negligence of the company causing the injury was "bad oil."

The plaintiff in his brief says:

"The jury found that the company itself had taken reasonable measures to supply itself with fair oil, and it also found upon the testimony that the particular oil used by Anders was furnished by the company and was bad oil; and that this oil was reported to the conductor, and good oil was not supplied."

But such a construction practically ignores finding No. 45, which is almost if not entirely contradicted also

Anders v. Railway Co.

by Nos. 51 and 52, which were that the conductor used the same quality of oil "at or about the time of the accident that was used by the plaintiff, J. W. Anders and obtained from the same source of supply," and that this was also defective. No. 66 was that the kind and quality of signal oil "which the defendant company was furnishing for the use of its trainmen's lanterns at and prior to the time of plaintiff's injury" was of the same kind and quality it had been furnishing for the past fifteen years. The company either was or was not "using in its lanterns" and "furnishing for the use of its trainmen's lanterns at and prior to the time of plaintiff's injury" the best quality of signal oil that could be purchased on the market, but to all practical intents and purposes the jury have found both that it was and that it was not. One line of findings is in harmony with the general verdict while the other is in conflict therewith and with the former line—such conflict that reconciliation without elimination seems impossible—and the motion for a new trial should have been sustained. (*Burnett v. Street Railway Co.*, 90 Kan. 282, 133 Pac. 534.)

Certain other rulings are complained of but we find no substantial error therein.

The judgment is reversed and the cause remanded for further proceedings.

PORTER, J. (dissenting) : I dissent from that part of the opinion and corresponding portions of the syllabus which hold that a promise to remedy a defect could be implied from the fact that the person to whom the complaint was made stated that he had reported it.

The jury find, as they were compelled to find from the undisputed facts, that the defendant had exercised not only reasonable diligence but extraordinary diligence to furnish the best quality of signal oil that could be purchased in the market, and had done this for fifteen years. The case is now sent back for another trial to

permit a jury once more on pure speculation to find that notwithstanding this extraordinary diligence the company was negligent because the oil in plaintiff's lantern smoked. The case has been tried twce; and at neither trial was any negligence shown against the defendant. Upon the special findings judgment should be ordered against the plaintiff.