JAY LUPHER, *a Minor, etc., Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

No. 17,487.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Question of Fact for Jury.* Whether or not an accident was caused by the negligence of the defendant is an inference of fact for the jury to determine, and not of law for the court, notwithstanding the evidence may be contradictory, uncertain, and confusing.

2. —— *Same.* In this case it is held that the plaintiff's account of the way in which the accident occurred can not be said as a matter of law to be inherently improbable.

3. —— *Dangerous Place—Complaint — Promise to Repair— Assumption of Risk.* The plaintiff, a brakeman, was injured while throwing a switch by reason of conditions which made

Lupher v. Railway Co.

the place unsafe. Three weeks before the accident he complained to the division roadmaster that the conditions at the switch made it unsafe. The evidence was that the roadmaster said "He knew it wasn't a very nice place there and not any too safe and they were going to fix it up when they could get to it and make a double track . . . and we would head in there and not have to make that switch." *Held*, a sufficient complaint and promise to relieve plaintiff of the assumed risk.

4. ——— *Same*. Upon the facts stated in the preceding paragraph, *held*, that the division roadmaster stood in relation to the plaintiff as a vice principal of the defendant and that whether or not plaintiff was warranted in relying upon the promise was for the jury.

5. ——— *Same*. The question whether or not under all the circumstances of this case the time which elapsed between the promise and the accident was a reasonable time for the performance of the promise was for the jury to determine.

6. ——— *Same*. Where complaint is made and the servant is assured that it is the intention of the master to remove the danger, and, relying upon such assurance, the servant continues in the work, the fact that the master had other reasons than the safety of the servant for making the change, or that before the complaint he had intended to make it, will not render the promise ineffectual.

7. VERDICT—*Excessive Amount—Passion or Prejudice*. The court refused to approve a verdict for $17,000 for the loss of a leg, and required the plaintiff to remit $4,000, rendering judgment for $13,000. *Held*, there being nothing to show that the excessive amount was caused by passion or prejudice of the jury, the judgment will not be set aside.

Appeal from Neosho district court. Opinion filed March 9, 1912. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* for the appellant.

*H. P. Farrelly,* and *T. R. Evans,* for the appellee.

The opinion of the court was delivered by

PORTER, J.: The plaintiff, while in the discharge of his duties as brakeman, was run over by an engine, and his left leg was so badly crushed as to require amputa-

tion midway between the knee and the hip. He alleged that the injury was caused by the negligence of the defendant in furnishing a dangerous place in which to perform his work. The jury returned a verdict in his favor for $17,000. The court overruled a motion for a new trial upon condition that plaintiff would consent to a reduction of $4000. The plaintiff filed his written consent thereto and judgment was entered in his favor for $13,000. The defendant appeals.

The plaintiff was injured on July 30, 1906, about two o'clock in the morning. He was head brakeman on a freight train aproaching the city of Chanute, and was riding on the engine. His duties required him to get down from the engine before reaching the switch, run ahead, and throw the switch, so that the train could head in on the siding without stopping on the up grade. The manner in which plaintiff claims that the accident occurred is set out in his petition as follows:

"The position and arrangement of the switch stand were such that the position of plaintiff, after having thrown the switch, was in close proximity to the track upon which said engine was coming, and in the efforts of the plaintiff to protect himself from injury, and to get away from said engine, by reason of the dangerous condition of said track, the ties thereunder, the location of said switch stand, the approach thereto and its surroundings, and the condition of the surface of the ground, all of which were in an improper and dangerous condition, the plaintiff in making an effort to escape from said engine, slipped and stumbled over the ties, mud and irregular surface of the ground, and fell upon the track in front of said engine."

The evidence is not at all clear as to how the plaintiff, while throwing the switch, fell across the track in front of the approaching engine; nor is it clear from either the petition or the evidence what particular defect in the condition of the track, roadbed, ties or switch stand caused him to fall. The railway company claimed at the trial and offered evidence tending to show that he

Lupher v. Railway Co.

fell from the pilot of the engine while attempting to board the engine as it passed him, contrary to the rules of the company, and that his own negligence in this respect was the sole cause of his injury. The defendant's evidence on this question was wholly circumstantial; no one on the engine saw him fall. There was evidence showing that the pilot step was muddy, indicating that some one with mud on his feet had used it, and also evidence that the first place on the track where blood was found was on the west rail of the track seven feet south of the head-block. The train was moving south at the time of the accident and the switch-stand was west of the track. The engineer testified that after the switch was thrown he received from plaintiff what he thought was a signal to come ahead, that he saw a light a foot or so from the ground which he supposed to be plaintiff's lantern moving toward the track, that he saw it just ahead of the pilot beam and then it suddenly went out. Doctor Barker and brakeman McGlasson, witnesses for the defendant, testified that the plaintiff, in answer to an inquiry of the doctor, stated that he tried to get on the pilot and slipped off.

The plaintiff's own testimony of how the accident occurred is as follows:

"In coming down to the switch from the north you would have to walk in the middle of the track or get out into the muddy ditch. The lever that manipulated the switch was about two feet long. In order to throw the switch so as to put the train on the west siding you had to push the lever towards the east, towards the rail. That would be towards the train. . . . I left the engine about fifty feet north of the switch. The engine was running about five or six miles an hour at that time. The ditch was muddy and wet and rough. The lever that I had to use was on the south side of the switch-stand and I had to pass around the switch-stand. The switch was locked. I unlocked it and turned it around towards the east and throwed it in this way. I had to come down against it with my weight, in fact I had my knee on the

head of the lever. I´shoved it in front of me to the east side. When I got to the east side and shoved it down in there and threw my weight on it with my knee, I went to straighten up and slipped and stumbled off of those ties kind of backwards, this way (illustrating). I fell towards the east and south and stumbled on one of the ties that was on the rails and fell on the track and I tried to get up but my hands slipped and went between the ties and before I could get up and get away the engine caught my foot and injured my leg. I´fell in a southeasterly direction. The engine was approaching me when I lay on the track. I tried to get out of the way of the engine. I used every exertion I could to get off the track. When I speak of my hands, of my hands going off of the ties, I was kind of face down at that time with my hands on the ties and my hands slipped and went in between the ties and before I could get away it ran over my foot and leg."

Counsel for defendant contend that plaintiff's account of how the accident occurred is inherently improbable. In their brief they say:

"He states that while standing on the east side of the switch he fell backwards in a southeasterly direction. This would throw his head toward the track and his feet away from the track. He states that when he tried to get up his hands slipped and went between the ties and before he could get up and get away the engine caught his foot and injured his leg; that he was kind of face down with his hands on the ties and before he could get away it ran over his foot and leg, but he got his body off. It is impossible to understand from this description how his legs, which must have been extending away from the track, could get under the engine wheels; nor, if he fell backwards, how he came to be lying face downwards. If he fell with his head toward the track with his hands between the ties, all he had to do was to push the upper part of his body away from the track and his whole body, legs, feet and all, would have been clear of the track."

The switch stand appears from the evidence to have been no different from those usually found at such places, and the defendant insists that there was no

testimony showing that it was not wide enough for a
man to stand upon and throw the switch without fall-
ing off, or that ample room was not afforded on the
platform between the switch stand and the track for a
man to stand without being struck by a passing engine
or train. The following excerpt from the brief will
explain, better than any statement we can give, the
theory of plaintiff's counsel as to how the accident oc-
curred and what defect in the conditions and surround-
ings caused it to happen:

"The evidence shows that it was necessary for
the plaintiff, in order to get to the switch, to
wade up through a muddy ditch, and of course,
this would make his feet wet and muddy. The evi-
dence further shows that when he got to the switch,
the platform consisted of the head block, the width
of which was mostly taken up with the switch stand
and the rod leading from the rails to the stand,
and two old rotten discarded railroad ties, which were
uneven as far as the surface was concerned, and that the
first one, next to the head block, was about two inches
lower than the top of the switch block, and that the
second tie was still lower than the first, hence, when
the plaintiff after getting to the switch, having passed
through the wet muddy ditch, went to straighten up
after he had thrown the switch and pushed the lever
of the same down into the notch, that his foot slipped
off of the head block onto the first tie. This threw him
off of his center of gravity, and started him to falling
backwards, and the second tie being still lower than
the first, kept him falling; then when he struck the
ties under the rails, which were naked at that place,
and sticking out, they still kept him falling, and of
course, as any man would naturally do, he attempted
to recover himself, and would naturally, turn his face
towards the way he was falling."

The jury, in answer to special questions submitted
by the plaintiff, found that he was not guilty of any
contributory negligence and that the accident was
caused by the failure of the defendant to provide plain-
tiff a reasonably safe place at which to work. In

answer to special questions submitted by the defendant, they found that plaintiff was familiar with the condition and all the surroundings at the switch; that south of the head block there were two ties forming the platform, each 16 inches wide; that the head block was 12 inches wide; that the switch stand was from four to six feet from the west rail; that blood was found on the west rail seven to nine feet south of the switch stand, that just after the accident there was mud on the step on the right-hand side of the pilot which seemed to have been scraped off of a man's shoe; that plaintiff's shoes were wet and muddy when he threw the switch; that after the switch was thrown the engineer saw, or thought he saw, a light near the west rail about a foot and a half from the ground; that the train was moving three to five miles an hour; that plaintiff knew that he was forbidden by the rules of the company to step upon moving trains, and that it was his duty to obey this rule.

The conclusion which the court has reached is that the inferences to be drawn from the somewhat confusing account of how the accident was caused are inferences of fact for the jury to determine, and not of law for the court; and that it can not be said that plaintiff's statement is so inherently improbable as to require the verdict to be set aside. The question is one which has so frequently been considered by the court that an elaborate citation of cases in point is not deemed necessary. (*C. B. U. P. Rld. Co. v. Hotham,* 22 Kan. 41; *Avery v. Railroad Co.,* 73 Kan. 563, 85 Pac. 600; *Railway Co. v. Watkins,* 76 Kan. 813, 92 Pac. 1102; *Johnson v. Railroad Co.,* 80 Kan. 456, 103 Pac. 90, and cases cited.)

Plaintiff concedes that the injury resulted from one of the risks which he assumed and that he is entitled to recover only upon proof showing a complaint to the master of the defective conditions which caused the injury, a promise to remedy the defects,

and the master's failure to do so within a reasonable time. The main contention of the defendant is that the proof offered fails to show either a complaint or a promise sufficient to relieve plaintiff of the assumed risk. In support of the allegations of the petition respecting a complaint and promise to repair or remove the defective conditions the plaintiff testified:

"I remember being up at that switch something like three weeks before I was injured. I was making a run to throw the switch then. That night I got off of the head car. I was running alongside of the engine. I slipped and stumbled on something, a rock or cinder, and threw me onto the engine, and struck the side-rod with my left hand. I was not injured at that time. After that I talked with A. W. Hadeen about the condition of that switch. He was division roadmaster with headquarters at Chanute. That was a day or two afterwards. I had the conversation with him in front of the reading room at Chanute. I told him the condition of that place and about it being very wet and muddy and rough there and it was n't a safe place. He said he knew it was n't a very nice place there and not any too safe and they were going to fix it up when they could get to it and make a double track from the Katy crossing and we would head in there and not have to make that switch. What Mr. Hadeen said would be done was done after that. They put in a double track the summer or fall after my injury. Since then it has not been necessary to make that switch at all in there.

"Q. At the time and after he told you that repair and change would be made, you may tell the jury whether you depended on his statement or not then after that time. A. Yes, sir.

"Q. And whether or not that was at least one of the reasons why you continued in that service. A. Yes, sir; I depended on his promise."

On cross-examination he testified:

"I told my lawyer that I had had a talk with Hadeen whenever it was that he asked me that question. I never told him until he asked me. Mr. Farrelly asked me, I believe. He asked me the question at home. He asked me if I had ever had any talk with Mr. Hadeen, and I told him that I had. I never mentioned the

matter to him until he asked me the question. I don't remember when he asked that question. I suppose it was the same time when he brought the suit."

Andy Hadeen was called as a witness by the defendant. He testified that he had not been in the employ of the defendant for two years; that prior thereto he had been division roadmaster for the company ·at Chanute; had known the plaintiff since about two years before the accident; that at no time or place did plaintiff ever tell witness that the switch was dangerous or unsafe, that witness never said to plaintiff that it would be fixed, or that the company was going to make a double track, nor did he make the plaintiff any promise. He testified that he received orders to put in the double track several months before the accident occurred and that there had been a lot of grading done before that. The jury, in answer to special questions, found the facts respecting the complaint and promise as testified to by the plaintiff, and also found that the defendant had determined to make the change and to build the new track in 1905, and that the grade was completed before the accident.

The defendant maintains that the complaint pointed out no defects in the premises that required repair, and that it had no reference to the defects which the jury found to be the cause of the accident. The complaint seems to have had more specific reference to the condition of the track where plaintiff says he stumbled three weeks prior to the accident. This was before he reached the switch stand, and apparently his stumbling at that time was caused by the ground being wet, muddy and rough at the side of the track. At one point in his testimony he said:

"It was more dangerous at some times than at others because of the Kavanaugh shops there. Sometimes they would wash out the boilers and it would make more water there and it would be more muddy. . . . I knew for three weeks before I got hurt that it was n't

a safe place.  .  .  .  I had the talk with Mr. Hadeen because I thought I was liable to be hurt there."

It must be admitted that the complaint is rather indefinite with respect to the particular negligence which the jury based their verdict upon.  Asked to state fully in what the want of care and prudence on the part of the defendant consisted, the jury answered "Bad platform and lack of ballast."  The complaint, according to the testimony, was this:

"I told him the condition of that place and about it being very wet and muddy and rough there and it was n't a safe place."

Although there was no menton of any defect or dangerous condition of the platform, or of lack of ballast; and while, obviously, nothing that happened to the plaintiff on the occasion which induced him to make the complaint could have resulted from the conditions of the platform or from lack of ballast between the rails, still it appears from the reply which the roadmaster made to the complaint that the general conditions at the switch were in the minds of both.  According to the plaintiff's testimony Hadeen said "he knew it was n't a very nice place there and not any too safe."

It may be conceded that the law is well settled that before the servant can avail himself of a promise to repair or alter conditions it must appear that the injury sued for was caused by some defect covered by the promise.  (1 Labatt, Mas. & Serv. § 421.)  He will not be permitted to extend the promise to some unanticipated risk, because unless the promise to repair includes the danger, he can not be said to have remained in the service by reason of the promise.  In *B. & Colo. R. R. Co. v. Liehe,* 17 Colo. 280, 29 Pac. 175, the plaintiff was injured by a defective rod on a hand car.  He admitted in his testimony that he had said nothing about the defect in the rod.  He testified that all he said to the section foreman to whom he

complained was that the hand car was in "bad shape" (p. 285), and that the foreman promised to repair it. It was held that this was not sufficient; that he should have pointed out with more particularity the defect which caused him to believe the car unsafe. This seems to go as far as any of the cases cited in the briefs, and the situation presented is somewhat analogous to that in the case at bar. We can not approve the doctrine. It hardly seems to accord with justice to hold that the servant who complains to the master that an instrument like a hand car is in bad shape and who receives and relies upon a promise to have it put in proper shape should be held to assume all risk of injuries that may thereafter be caused by its defective condition simply because in his complaint he fails to enumerate the specific defects. Upon notice and complaint that a specific thing or place is in unsafe condition, a promise to make general repair ought to be sufficient. In this case we think the complaint was sufficient to call the master's attention to the defective condition of the switch and its surroundings.

It is next contended that the promise is insufficient for the reason that roadmaster Hadeen was not in authority over plaintiff or authorized to make the changes claimed to have been promised; and for the further reason that it appears from plaintiff's testimony, as well as from the findings, that the changes had already been determined upon by the company without any reference to the safety of the plaintiff. In other words, that the complaint was made to one without authority to bind the company by a promise to repair; and that the reply made by Hadeen was not a promise but a mere statement of the company's intentions to make certain changes in the future which would do away entirely with the use of the switch. In support of the contention that Hadeen was not a vice principal it is said that the trainmaster, not the roadmaster, had authority over the brakeman; that there was no showing that Ha-

deen's duties required him to determine what should
be done for the safety of the men in the train service;
and so it is argued that any promise he may have made
in regard to such matters would have had no more force
or effect than his promise to raise plaintiff's wages in
consideration of plaintiff's remaining in the company's
employ.   It is argued also that the alleged promise did
not cover the ordinary repairs that would fall within
the scope of a roadmaster's duties, such as to make a
better platform or put in more ballast, but embraced
radical changes and improvements which would neces-
sarily come from higher authority.   The division en-
gineer in charge of the civil engineering work on that
division testified that about the year 1905 his depart-
ment received instructions to do the necessary grading
for the new track; that the contract for the grading
was made on July 31, 1905, and that all the work of
grading was performed prior to February, 1906, six
months before the injury.   Hadeen testified that the
new track was laid in December, 1906, six months after
the injury.   The jury found that the things promised to
be done by Hadeen had already been determined upon
by the higher officials of the company in 1905 and that
no change was made in the tracks or switch stand by
reason of the accident to the plaintiff.

The courts have quite generally ruled that the prom-
ise, in order to relieve the servant, must be made by
the master or one standing in his place.   If made by a
fellow servant, authority to bind the master must be
shown.   (*Cicalese v. Lehigh Valley Railroad Co.,* 75 N.
J. Law, 897, 69 Atl. 166; *Wilson v. Winona & St. Peter
R. Co.,* 37 Minn. 326, 33 N. W. 908, 5 Am. St. Rep. 851;
*Burgess v. Humphry Bookcase Co.,* 156 Mich. 345, 120
N. W. 790; *United Zinc Companies v. Wright,* 156 Fed.
571.)   In one case, at least, it has been held that it is
immaterial whether the servant making the promise
had authority to do so, provided the injured servant,
upon reasonable grounds, supposed him to have.   (*Dells*

*Lumber Co. v. Erickson,* 80 Fed. 257.) This is directly in conflict with *Cicalese v. Lehigh Valley Railroad Co.,* supra. The defendant here contends that the plaintiff should have complained to the trainmaster, who was his superior. In *Chesapeake O. & S. W. R. Co. v. McDowell,* 16 Ky. Law Rep. 1, 24 S. W. 607, cited and relied upon by the defendant, the plaintiff who was injured had complained to the person in charge of the employment and discharge of the workmen in the shop, and it was held that he could not recover for the reason that he should have complained to the person in charge of the machinery and repairs. The case therefore upholds the action of the plaintiff in complaining to the roadmaster.

The employee who made the promise or gave the assurance in the present case was the division roadmaster, to whom the plaintiff took his complaint. He had apparently more authority over repairs and alterations of the character which the plaintiff obviously sought to have made than a trainmaster would have. Perhaps the regular order of procedure would have been for a brakeman to complain to the trainmaster, who would naturally take up the matter with some employee whose duties involved repairs of the kind needed. The plaintiff went over the heads of those superior to him in his own line of work and took his complaint to the person he evidently supposed had authority to make the slight changes and repairs necessary in this case to render the place reasonably safe. Under the circumstances we think the question whether he was warranted in relying upon the promise made to him by the division roadmaster was one of fact for the jury.

Cases will be found which go to the extent of holding that a promise is ineffectual unless it appears that the immediate purpose of the complaint and promise of a change in conditions was to secure more effectually the personal safety of the servant. (1 Labatt, Mas. & Serv.

§ 421; *I. & G. N. Ry. Co. v. Turner,* 3 Tex. Civ. App.
487, 23 S. W. 146; *Lewis v. New York, &c. Railroad,* 153
Mass. 73, 26 N. E. 431, 10 L. R. A. 513.)   The latter
case illustrates the harshness of the rule as to the as-
sumption of risk.   There the plaintiff's duties required
him to go upon a pier which had become unsafe because
of the decayed condition of the supports.   He called the
attention of the superintendent to the condition and
urged its repair and was assured that the repairs would
be made; but for the reason that it appeared that he
did this, not on his own account nor because the dis-
charge of his duties was rendered more dangerous, or
because he had any intention to leave if the pier was
not repaired, but acted in the interests of the company
and to prevent strangers from being injured, it was
held he could not recover.   Where complaint is made
and the servant is assured that it is the intention of
the master to remove the danger, and, relying upon
such assurance, the servant continues in the work, we
think it is of no importance that the master had other
reasons than the safety of the servant for making the
change in the conditions, or that before the complaint
he had intended to make the alterations which would
result in removing the danger.   Whether the servant
relied upon the assurance or promise that the danger
would be removed is the important inquiry.

The claim that the promise was ineffectual for the
reason that it was not made for the purpose of insuring
the safety of the plaintiff and because it had already
been determined upon by the master before the com-
plaint was made, is answered to some extent by the case
of *A. T. & S. F. Rld. Co. v. Sadler,* 38 Kan. 128, 16 Pac.
46, where the promise to furnish new tools was made
by the company to the section foreman, and it was held
that the promise inured to the benefit of all employees
on the section in whose presence and hearing it was
made, although the jury found that the plaintiff had
made no complaint at all.

In *Railway Co. v. Sledge*, 68 Kan. 321, 74 Pac. 1111, the master mechanic, in the presence of the plaintiff, directed the engineer to go ahead and use an engine which was defective and he would have it repaired. The plaintiff, who was a brakeman, relied upon the promise made to the engineer and continued at work with the engine and was injured the next day by reason of its defective condition. It was held that he was relieved of the risk for a reasonable time after the promise.

The promise in this case was that "they were going to fix it up when they could get to it and make a double track from the Katy crossing and we would head in there and not have to make that switch." The most serious objection urged to the promise is that the time when the switch was to be fixed is coupled to the time when the company was to make a double track from the Katy crossing. The grading for the new track had been made for several months previous to the promise, and there is some force in the suggestion that plaintiff, being familiar with the situation, must have known from what was said that no change of conditions at the switch would be made for a considerable time, and that, therefore, the promise was too indefinite as to time to justify him in relying upon it. In the leading case of *Hough v. Railway Co.*, 100 U. S. 213, 25 L. Ed. 612, the following language was quoted (p. 225) with approval:

"There can be do doubt that, where a master has expressly promised to repair a defect, the servant can recover for an injury caused thereby, within such a period of time after the promise as it would be reasonable to allow for its performance, and, as we think, for an injury suffered within any period which would not preclude all reasonable expectation that the promise might be kept." (Shearman & Redf., Negligence, 3d ed., § 96.)

The court also adopted (p. 225) the language of Mr. Cooley in his work on torts, as follows:

"If the servant, having a right to abandon the service

because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume its risks." (Cooley on Torts, 1st ed., p. 559.)

We think that the promise must be held sufficiently definite, and that the question whether or not the time was a reasonable one for the performance of the promise was a question for the jury. It was so held in *Dowd v. Erie R. R. Co.*, 70 N. J. Law, 451, 57 Atl. 248, where the promise was to have the defect attended to "as soon as he could." (p. 456.) The general rule, with few if any exceptions, is that the question of reasonable time for the performance of the promise is for the jury. (*Morbach v. Mining Co.*, 53 Kan. 731, 37 Pac. 122.)

The defendant cites many cases holding that an excessive award of damages vitiates the whole verdict and requires that it be set aside and a new trial ordered, and relies especially upon the cases in which it has been held that verdicts not approved by the trial court because excessive should have been set aside instead of being reduced by allowing a remittitur. *Steinbuchel v. Wright,* 43 Kan. 307, 23 Pac. 560, was an extreme case. The action was slander, and the amount allowed was $4000. The court, in overruling a motion for a new trial, found that all of the amount above $500 was excessive, and allowed the plaintiff to remit $3500. It was held that in a case of that character a verdict which was seven-eighths excessive ought not to be the basis of a judgment, and therefore a new trial was ordered. Special attention is called to the language of the opinion in *A. T. & S. F. Rld. Co. v. Dwelle,* 44 Kan. 394, 410, 24 Pac. 500. The action was for damages for the wrongful ejection of a passenger. The verdict was

for $4000. The trial court found it to be excessive, but allowed the plaintiff to remit one-half of the amount, and gave judgment for $2000. It was said in the opinion that the court should have gone further and ordered a new trial, but this was said because in passing upon the motion for a new trial the court stated that doubtless error had been committed in allowing the closing argument of plaintiff's counsel to proceed over the protest of the defendant, and that the argument was so heated and inflammatory that the jury were probably misled by it. In the present case the record merely discloses that the trial court believed the verdict to be excessive to the amount of $4000, but there is nothing to show that the excess in the amount was caused by the passion or prejudice of the jury or that the trial was not fairly conducted. While we are of the opinion that the verdict was excessive and that the amount of the judgment is a liberal award, still, in view of the age and health of the plaintiff at the time of his injury, we are not able to say that it should be set aside.

The judgment is affirmed.

PORTER, J. (dissenting) : While the courts should not extend the harsh doctrine of assumed risk, I believe that, until it shall be by appropriate legislation abrogated as a defense, it is the duty of the courts to enforce the rule upon principles which have been heretofore recognized as controlling. In this case the promise which the plaintiff claims to have relied upon was nothing more than a statement that it was the intention of the company, as soon as the double track could be put in, to do away with the use of the switch at that place. While this would result in the removal of the dangerous conditions, it was a change which the company had long before determined upon, without reference to the plaintiff's safety. This feature I do not regard as controlling, but the fact that plaintiff knew

Lupher v. Railway Co.

that the change was not going to be made by reason of his complaint, and also knew that the statement could not have been made for the purpose of inducing him to continue in the service—these are important. Besides, it was expressly stated that the change was to be made when the double track was put in, and plaintiff knew just how far this had proceeded and could see what progress was being made upon it. He knew the change was not expected to be made within a day or two, or even within what might be called a reasonable time. His testimony is:

"What Mr. Hadeen said would be done was done after that. They put in a double track the summer or fall after my injury. Since then it has not been necessary to make that switch at all in there."

I agree with the majority opinion that the important inquiry is whether the servant relied upon the promise, provided it was such a promise as he had the right to rely upon. In this case it seems absurd to say that the plaintiff had any right to rely upon the statement that a double track was to be put in and the use of the switch done away with. It was not to be done for his benefit; it was not expected to be done at all in the near future, or within what a jury would have the right to say, under the admitted facts, was a reasonable time. He remained in the dangerous employment for three weeks after the alleged promise, and, so far as the evidence shows, without anything being done which might have induced him to believe that the double track was about to be completed, or that it would be completed within a reasonable time. Having no reason, from what was said to him by Hadeen, to expect that any change would be made in the conditions of the switch until its use would be done away with by the building of the double track, I think he assumed the risk by remaining in the service, with full knowledge, which he says he had, of the danger.

I think this verdict, almost one-fourth of which was

set aside by the trial court as excessive, was in its entirety such as to come fairly within the rule fixed by the legislature, that a verdict "shall be vacated . . . when it appears" that it was "given under the influence of passion or prejudice." (Civ. Code, § 305.)

WEST, J., concurs in this dissent.