J. W. BARKER, *Appellee*, v. THE KANSAS CITY, MEXICO & ORIENT RAILWAY COMPANY, *Appellant*.

No. 17,958.

SYLLABUS BY THE COURT.

1. EVIDENCE — *Letter Press Copies of Waybills — Competent.* The defendant, having shown the loss of certain waybills indicating the destination of two of the cars in question, offered in evidence letter press copies, which were refused. *Held*, error.

2. EVIDENCE—*Chalk Marks on Car—Probative Effect Of.* Evidence that upon one freight car of the train in question, at some time by someone unknown, there had been written with chalk the name of a certain station, and that destinations were sometimes thus indicated, is not sufficiently probative to warrant a finding that such car was then being moved to such station.

3. INSTRUCTIONS—*Assumption of Facts in Issue.* Instructions should not by their language appear to assume as proven a matter sharply disputed by the parties.

4. "EMPLOYERS' LIABILITY ACT"—*To What Employees it Applies.* Before an employee can recover for an injury under the federal employers' liability act (35 U. S. Stat. at L. p. 65) it must appear that at the time of the injury the defendant railroad was engaged in the work of interstate commerce and that such employee was by the carrier employed in such commerce. To constitute him a person so employed his work at the time of the injury must have had a real and substantial connection with the interstate commerce in which such carrier was then engaged.

.5. MOVING CARS—*From One State to Another—Interstate Commerce.* An interstate railroad when engaged in moving cars of water or coal over its line from one state into another for use in its own engines is engaged in interstate commerce.

6. MASTER AND SERVANT—*Assumption of Risk—Valid Defense.* Assumption of risk is a good defense to an action under this act, except when the violation by the carrier of some statute enacted for the safety of employees has contributed to the injury or death of the employee. And when such defense is pleaded and supported by the evidence it is the duty of the court to instruct thereon.

7. DAMAGES—*Items Not Proven.* An item of damage allowed for an injury neither proved nor found should be deducted from the amount of the verdict.

8. CONTRIBUTORY NEGLIGENCE—*Instructions—Burden of Proof.* When the court charges that the plaintiff was guilty of contributory negligence, no error prejudicial to the defendant is committed by another instruction that the burden is upon the defendant to show such negligence.

9. SPECIAL QUESTIONS—*For Jury—Purpose of the Statute.* The purpose of the statute (Civ. Code, § 294) providing for the submission of special questions is to "direct the jury to find upon particular questions of fact," not to invade the domain of medical or metaphysical science in an attempt to separate and distinguish between constituent elements of physical injuries.

Appeal from Sedgwick district court, division No. 2. Opinion filed February 8, 1913. Reversed.

*John A. Eaton, D. W. Eaton, H. J. Eaton,* all of Kansas City, Mo., *R. L. Holmes, C. G. Yankey,* and *Chester I. Long,* all of Wichita, for the appellant.

*David M. Dale, S. B. Amidon, B. F. Hegler,* and *Jean Madalene,* all of Wichita, for the appellee.

The opinion of the court was delivered by

WEST, J.:  J. W. Barker, a fireman on a switch engine of the defendant, sued to recover damages for injuries received by him upon the turning over of such engine while on a trip on the main track between Clinton and Altus, Okla.   He alleged that on or about December 17, 1909, he was ordered to go to Clinton, Okla., where he was ordered to return to Altus on the 18th; that his engineer was ordered to take back nine carloads of coal and a water car from Clinton to Altus, and while the switch engine was drawing this load it turned over and injured him; that wooden blocks had been placed under the engine to relieve the strain and friction on certain bearings and springs in lieu of proper appliances, and that it was also defective in that it had no pony trucks or pilot and was constructed for switching in yards and not for use on the main line; that the track where the injury occurred was rough and uneven, and unballasted except by dirt lying on the track which was insufficient.   The defendant, after a general denial, pleaded contributory negligence and assumption of risk.   The jury returned a verdict in favor of the plaintiff.   Error is assigned on overruling a demurrer to the evidence, refusing certain testimony, admitting certain testimony, refusing certain instructions, giving certain other instructions, and overruling a motion for judgment upon the special findings and a motion for a new trial.

The right of recovery is based upon the violation of the federal employers' liability act.   It is claimed by the plaintiff that the cars in the train at the time of the injury were transporting interstate commerce.  The court expressly limited this question to the facts concerning one car which the plaintiff asserts was destined for Sweetwater, Tex.

The court charged the jury that the plaintiff was

guilty of contributory negligence, but failed to charge as to assumption of risk.

The defendant insists that the train in question was engaged exclusively in intra-state work; that the court erred in refusing to charge as to assumption of risk; that the testimony showed that the plaintiff in fact assumed the risk, and that the verdict was excessive.

Two of the cars had been diverted from their original destinations and rebilled. The two waybills from the point of diversion appear to have been in the possession of the engineer, who was killed, and the defendant offered proof of their loss and sought to introduce letter press copies thereof in order to show the destination of the car already referred to. This evidence was competent and it was error to reject it. (Civ. Code, § 384; *Darling v. Railway Co.,* 76 Kan. 893, 94 Pac. 202; *Richolson v. Ferguson,* 87 Kan. 411, 124 Pac. 360; *Glass Co. v. Pierce,* 87 Kan. 548, 125 Pac. 108; *Bourquin v. Railway Co.,* ante, p. 183, 127 Pac. 770; *Railroad Co. v. Thirlwell,* ante, p. 275, 128 Pac. 199.)

The evidence tended to show that the plaintiff was familiar with the engine in question, with the fact that it was not proper for service on the main track, and the fact that the track was bad where the injury occurred, and there was nothing showing or tending to show that he made any complaint or hesitated to carry out the orders to bring the train from Clinton to Altus. Testimony was introduced showing that the defendant had a rule, of which the plaintiff had knowledge, requiring conductors and engineers to show their train orders to the brakeman and fireman, who must read and return them, and should there be cause to do so they are to remind the conductor or engineers of their contents; that in going to Clinton the conductor had a slow order which he showed to the plaintiff, but the plaintiff did not call his attention thereto at any time. Whatever of utility or futility a reminder would have had, he failed to follow the rule, but as the jury were in-

structed that he was guilty of contributory negligence the defendant can not complain.

There was testimony showing that it was customary for train men to mark on cars the number or name of the station to which they were destined. The plaintiff testified that there were marks on cars of this train; some of them were marked Altus and some Sweetwater; that as nearly as he could remember one car was marked Sweetwater; that Sweetwater is in Texas and a division point. He further testified that he did not know which one had this marking on, but he thought one of them did; that it was made with chalk, but he did not know when. On being recalled he testified that switchmen put chalk marks on the cars practically all the time at Clinton; that he noticed a chalk mark on one of these cars.

"It looked as though it had n't been on many days; could not say exactly. That the name of the point on that car was Sweetwater, Texas."

That he should judge the chalk mark was a foot or eighteen inches in size.

"Very often put the number of the trains on the cars or write it—something like that.

"That when at work weighing coal cars the yardmasters would call how much the car weighed.

Q. "What would you put on the car then?

A. "I would put Altus, sometimes Clinton, sometimes Sweetwater.

Q. "What would that mean?

A. "It would mean that it was going to that place.

Q. "Do you know who put that mark on that car?

A. "I don't, not that coal car.

Q. "Do you know when it was put on?

A. "No, I say I don't know exactly what date.

Q. "Answer the question yes or no.

A. "I say no, sir."

Another witness said that he had seen the names of points at which cars had been left marked on the cars being the same town at which they were left. Com-

plaint is made that the court nine different times in the instruction used the expression "the car on which was marked in chalk the words Sweetwater, Texas," as it assumed a matter not proved and it was left to the jury to find whether one of the cars was thus marked and to determine from this and all the other facts whether it was engaged in interstate commerce. An examination of the plaintiff's testimony in chief and upon cross-examination when first upon the stand and when recalled taken together was not clear and satisfactory, and in view of the fact that the court had refused to permit the introduction of the letter press copies of waybills, one of which was supposed to have given the destination of the car in question, it was hardly proper for the court in instructing the jury repeatedly to refer to the car as the one on which the words "Sweetwater, Texas" were marked, because they might naturally believe that this amounted to an expression of opinion by the court that it was thus marked, although in two instructions it was left for them to say whether or not such was the fact. But assuming that at some time not shown and by some person unknown these words were put upon the car in question, it can hardly be said that the natural, fair and reasonable inference to be drawn therefrom is that at the time in question this car was actually in process of transportation to a point in another state, and especially so when this was made the vital and determining question in the case.

The act (35 U. S. Stat. at L. p. 65) provides:

"That every common carrier by railroad while engaged in commerce between any of the several States or Territories shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." (§ 1.)

In *Colasurdo v. Central R. R. of New Jersey*, 180 Fed. 832, a track walker was injured while assisting in repairing a switch in a railroad yard. The track was

Barker v. Railway Co.

used both for state and interstate commerce and it was held that this brought the case within the act. *Lamphere v. Oregon R. & Nav. Co.,* 196 Fed. 336, involved the question whether a fireman in the employ of a road engaged in interstate commerce, who was ordered to report at a station to be transported with others to another station to relieve the crew of an interstate train, was within the act and it was held that he was. It was held in *Pedersen v. Delaware, L. & W. R. R.,* 184 Fed. 737, that at the time of the injury both the carrier and the employee must be engaged in interstate commerce. The plaintiff was engaged in bridge construction and was injured while carrying material from one part of the work to another by a local train running between two points in New Jersey, and as this business was held to be wholly intra-state the plaintiff was not permitted to recover. This ruling was affirmed by the court of appeals. (*Pedersen v. Delaware, L. & W. R. Co.,* 197 Fed. 537.) *Behrens v. Illinois Cent. R. Co.,* 192 Fed. 581, was a case in which it appeared that a fireman on a switch engine was ordinarily employed in interstate commerce, though mingled with employment in commerce wholly within the state. He usually reported for duty at Chalmette, a terminal below New Orleans, not on defendant's road, to make up a train of empties and other cars for various destinations and going over its road, and also of empty cars to be returned to other roads. The crew would take such train to Harrahan, a terminal above New Orleans on defendant's road, and then take another train back. When the accident occurred the train being moved was composed of cars all originating in Louisina and destined for Chalmette, also in Louisina. It was held that the fireman was engaged in interstate commerce within the meaning of the statute and could recover. In *Darr v. Baltimore & O. R. Co.,* 197 Fed. 665, it was held that one employed in making running repairs, who was sent to replace a bolt which had been lost from the brake

shoe of a tender, was within the act. The engine and tender used by the company in moving interstate trains between two points, having reached the end of their run, had been placed on a fire track to await the time for starting on a return trip. It was decided in *Northern Pac. Ry. Co. v. Maerkl,* 198 Fed. 1, that an employee working in repair shops connected with an interstate track, engaged in repairing a car used by the defendant indiscriminately in both interstate and intra-state commerce, was employed by the defendant in interstate commerce within the meaning of the act. The supreme court held in *Interstate Comm. Comm. v. Ill. Cent. R. R.,* 215 U. S. 452, that the equipment of an interstate railroad, including cars for transporting its own fuel are instruments of interstate commerce; that coal received from the tipple of a coal mine into cars by a railway company intended for its own use, and transportation by it, is a matter within the control of the interstate commerce commission. In *Second Employers' Liability Cases,* 223 U. S. 1, the validity of the act was settled, but the question now under consideration was not involved. However, in speaking of the power to regulate commerce among the several states, it was said:

"Among the instruments and agents to which the power extends are the railroads over which transportation from one state to another is conducted, the engines and cars by which such transportation is effected, and all who are in any wise engaged in such transportation, whether as common carriers or as their employees." (p. 47.)

The court quoted with approval from the brief of the solicitor general:

" 'The act of interstate commerce is done by the labor of men and with the help of things; and these men and things are the agents and instruments of the commerce.' " (p. 48.)

The safety appliance act as construed in *Southern Ry. Co. v. United States*, 222 U. S. 20, embraces all locomotives, cars and similar vehicles used on any railway that is a highwav of interstate commerce, and is not confined to vehicles actually engaged in such commerce. In the opinion just quoted from, it was further said:

"The present act, unlike the one condemned in *Employers' Liability Cases*, 207 U. S. 463, deals only with the liability of a carrier engaged in interstate commerce for injuries sustained by its employees while engaged in such commerce. And this being so, it is not a valid objection that the act embraces instances where the causal negligence is that of an employee engaged in intra-state commerce; for such negligence, when operating injuriously upon an employee engaged in interstate commerce, has the same effect upon that commerce as if the negligent employee were also engaged therein." (223 U. S. 51.)

The court of appeals of the third circuit quoted part of this expression in *Pedersen v. Delaware L. & W. R. Co.*, 197 Fed. 537, and said that the object of this act was "to broaden the right to relief for damages suffered by railroad employees in interstate transportation, for the power of Congress to create such liability to such employees rests on the fact and acts of interstate transportation work which are being done both by the company and by the injured employee at the time of the injury." (p. 539.)

It was pointed out that, like the safety-appliance act, the statute in question has for one object the lessening of dangers to employees during interstate transportation, and *in pari materia* to broaden the relief for damages so sustained; also, that by the wording of the present act it is plain that liability was imposed, not for every injury done an employee of an interstate road, but for one done to him while he " 'is employed by such carrier in such commerce.' " (p. 540.) It was further suggested that in border-line cases the difficul-

ties can be met by bearing in mind, not only that the carrier must be engaged in interstate commerce, but the employee must at the time of the injury " 'have a real and substantial connection with the interstate commerce in which the carriers and their employees are engaged' " (p. 540) ; the relation of the employee's particular work to interstate transportation at the time the injury is sustained being the test; that the same kind of act may at one time be a part of interstate transportation and at another time have nothing to do with it; that one in helping to move interstate trains is within the act, but not when helping to move one purely local. This appears to be the latest, as well as the clearest, statement of the rule found in the federal decisions, and we adopt it as correct.

Whether the plaintiff comes within this rule depends on the facts shown. If the engine at the time was engaged in moving an interstate load, then the company and the plaintiff were doing interstate commerce work. The plaintiff testified that in 1909 the Orient was operating in Kansas, Oklahoma and a part of Old Mexico; that Altus is about 260 or 265 miles from Wichita; that he had been up and down the line in Kansas, Oklahoma and Texas; that he had seen this water car before, and that he knew it was up and down the line; "wherever they wanted it that is where they got it"; that it was used on the main line; that once when he went to Chillicothe, Tex., with a trainload of water this same car, as nearly as he could remember, was taken. Another witness testified that he had noticed a car of water being hauled up and down the line—all over the line. The plaintiff swore that at Clinton the defendant road connected with the Rock Island and Frisco, both of which roads were engaged in interstate traffic; that at Clinton cars were taken from and left for these roads; that the water car in question was got at Clinton. Another witness stated

that he had been over the road from Wichita to Sweetwater, Tex., which was the division point, south of Altus, Fairview being the next division point, south of Altus, and Wichita, the division point next north of Fairview; that the road is engaged in interstate traffic; that the water car in the train at the time of the injury was used for hauling water up and down the line for supplying the engines. There was considerable testimony showing that the nine other cars were loaded with San Bois smokeless coal, a semianthracite used along the line of the road; that while there is a slight change in the name of the company running from Altus into Texas, it is one continuous line. Seven of the cars of coal, from McCurtain, Okla., were consigned to the vice-president of the Kansas City, Mexico & Orient of Texas, whose office was at Sweetwater, Tex., and were being taken to Altus for delivery to that road; that the two other cars were billed to Aline, but by instructions they were being taken to Altus. The water car was being moved without waybill. These facts, with all the others, should have been submitted to the jury for such inference and findings as they felt convinced were warranted. The principle announced in the interstate commerce commission case already referred to (215 U. S. 452) seems directly applicable in case the jury should reasonably believe that the coal and water were being transported for use "up and down the line" in more than one state.

Section 4 of the act (35 U. S. Stat. at L. p. 66) provides:

"That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injury to, or the death of, any of its employees, such employee shall not be held to have assumed the risk of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

The natural meaning of this language is that assumption of risk would be a defense when there was no violation by the common carrier of such statute. If contributory negligence and assumption of risk are not different, it is passing strange that congress in its second enactment should expressly declare in section 3 that:

"The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

And in section 4:

"That in any action brought against any common carrier under or by virtue of any of the provisions of this act . . . such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

Such expressions are meaningless unless a clear distinction between contributory negligence and assumption of risk were recognized and intended. We should suppose that congress meant that contributory negligence should never be a matter of defense, but should be provable in mitigation of damages in all cases save those in which the carrier had also contributed to the injury by violating some safety statute; and that assumption of risk should be a complete defense except in case of such disregard of a safety requirement by the carrier. There is nothing to indicate an intention to hold the carrier liable ordinarily for an injury arising out of a risk assumed by the employee. In *Northern Pac. Ry. Co. v. Maerkl*, 198 Fed. 1, decided by the

court of appeals of the ninth circuit, the question of assumed risk was thus lightly touched:

"In respect to the defense set up of assumption of risk by him, it is sufficient to say that a risk arising out of the carrier's neglect, and of which the employee had no knowledge, was not one which can be held to have been assumed by him." (p. 6.)

In *Schlemmer v. Buffalo, Rochester, etc., Ry.,* 305 U. S. 1, a case under the safety-appliance act, the clause under consideration was that in section 8, that any employee injured by any car in use contrary to the provisions of the act shall not be deemed to have assumed the risk thereby occasioned, although continuing in the employment of the carrier after the unlawful use had been brought to his knowledge. It was said that the phrase as used in this clause extended to dangerous conditions, as of machinery, premises and the like, which the injured party understood and appreciated when he submitted his person to them; that in this class of cases the risk is said to be assumed because a person who freely and voluntarily encounters it has only himself to thank if harm comes, on a general principle of our law; that "probably the modification of this general principle by some judicial decisions and by statutes like section 8 is due to an opinion that men who work with their hands have not always the freedom and equality of position assumed by the doctrine of *laissez faire* to exist." (p. 12.)

Assumption of risk in this broad sense was said to shade into negligence as commonly understood, and the differences between the two to be more of degree than of kind, and that "when a statute exonerates a servant from the former, if at the same time it leaves the defense of contributory negligence still open to the master, . . . then, unless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name." (p. 12.) This was said to be especially true in Pennsylvania

(where the actions arose), where some cases at least seemed to have treated assumption of risk and negligence as convertible terms.    Justices Brewer, Peckham, McKenna and Day dissented and said that there is a vital difference between assumption of risk and contributory negligence, and quoted (p. 19) from Judge Taft in *Narramore v. Cleveland, C., C. & St. L. Ry. Co.,* 37 C. C. A. 499, that:

"Assumption of risk and contributory negligence approximate where the danger is so obvious and imminent that no ordinarily prudent man would assume the risk of injury therefrom.    But where the danger, though present and appreciated, is one which many men are in the habit of assuming, and which prudent men who must earn a living are willing to assume for extra compensation, one who assumes the risk can not be said to be guilty of contributory negligence if, having in view the risk of danger assumed, he uses care reasonably commensurate with the risk to avoid injurious consequences."    (p. 505.)

The court of civil appeals of Texas held in *Freeman v. Powell,* (Tex. Civ. App. 1911) 144 S. W. 1033, that assumption of risk is available to the defendant, and after quoting the provision of section 4, said:

"It thus appears that under the federal statute a complaining employee to whom the act applies is not relieved from the operation of the ordinary rule of assumed risk, except in cases where there is a violation by the carrier of some statute enacted for the safety of an employee which has contributed to his injury or death, and of this there is no contention in this suit."    (p. 1034.)

In *Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990, it was decided that if an employee with knowledge of the facts and appreciation of the danger voluntarily accepts the situation without complaint or promise of change he assumes the risk of a dangerous work.    After reviewing many decisions it was said:

"If the master fail to make the employment reasonably safe, and the danger takes on the aspect of a con-

tinuing condition which the servant knows about and understands or which is so patent that ordinary care would bring it to his attention and appreciation, he may accept the situation and continue to work without complaint. If he does so he assumes the risk." (p. 114.)

Assumption of risk as distinguished from contributory negligence was recognized in *Manufacturing Co. v. Bloom,* 76 Kan. 127, 90 Pac. 821; *Railway Co. v. Quinlan,* 77 Kan. 126, 93 Pac. 632; *Railway Co. v. Click,* 78 Kan. 419, 96 Pac. 769; *Iron-works Co. v. Green,* 79 Kan. 588, 100 Pac. 482; *Smith v. Railway Co.,* 82 Kan. 136, 107 Pac. 635; *Lewis v. Barton,* 82 Kan. 163, 107 Pac. 783; *Caspar v. Lewin,* 82 Kan. 604, 109 Pac. 657; *Cloud v. Railway Co.,* 82 Kan. 851, 109 Pac. 400; *Murphy v. Edgar,* 83 Kan. 627, 112 Pac. 109; *Lupher v. Railway Co.,* 86 Kan. 712, 122 Pac. 106, and *Karns v. Railway Co.,* 87 Kan. 154, 123 Pac. 758.

Moreover, since the decision in the Schlemmer case, (205 U. S. 1), the United States supreme court has put the question beyond doubt. In *Butler v. Frazee,* 211 U. S. 459, it was held that the common-law rule of assumption of risk has never been modified by statute in the District of Columbia and must be enforced. And in the Schlemmer case when again before the court (220 U. S. 590) it was unanimously decided that "there is a practical and clear distinction between assumption of risk and contributory negligence." (Syl.) The latter was stated to be the omission of the employee to use those precautions for his own safety which ordinary prudence requires, and the former was said to arise, in the absence of a statute taking away the defense, or such obvious dangers that no ordinarily prudent person would incur them, when the risk of the ordinary dangers of the occupation into which he is about to enter are known, or are so plainly observable that the employee may be assumed to know them, and he continues in the employ without objection.

(See, also, *Miller v. Monument Co.*, 141 Iowa, 701, 118 N. W. 518, 18 A. & E. Ann. Cas. 957, and note 960, and note to *Scheurer v. Rubber Co.*, 227 Mo. 347, 126 S. W. 1037, 28 L. R. A., n. s., 1215.)

It must be held, therefore, that assumption of risk was a good defense, and there being evidence to support it the trial court erred in refusing to instruct thereon.

As the case must go back it may be well to notice the defendant's complaint that the verdict was excessive.

The plaintiff alleged that he suffered permanent injury to his back, spine, hips and limbs; that he received a great nervous shock which caused great mental and physical pain and suffering, and that he believed such injuries were permanent. Practically all the medical testimony was confined to a burn on the shoulder and an alleged injury to the back. The only testimony touching any injury to the hip was that of W. C. Irwin, who said that plaintiff complained of injuries in his back and hips after the occurrence. To the question "What injuries, if any, do you find that plaintiff sustained by reason of the derailment?" the answer was: "Scalded shoulder and bruised back." The jury allowed $1000 for mental pain and suffering; for injuries to his back and spine, $2000; for injuries to his hip, $500, and for permanent injuries, $4520. After finding these sums, amounting to $3500 for mental suffering and injuries to the hip, back and spine, they were asked:

"Q. 50. Do you allow plaintiff anything for any other injuries? If so, for what injuries and for what amount? A. Yes. (See question No. 51.) Yes, for permanent injuries. Yes, for permanent injuries $4,520.00.

"Q. 51. Do you allow plaintiff anything on account of permanent injuries, if so, what amount? A. $4,520.00.

"Q. 52. Do you allow plaintiff anything on ac-

count of loss of earnings in the future, if so, what amount?   A.  No."

We find nothing in the evidence sustaining the allowance of damages for injuries to plaintiff's hip, and the allowance therefor should have been set aside.   The answers as to the other items are somewhat confusing, but giving them the interpretation evidently intended by the jury, we take it that they deemed the plaintiff damaged by his suffering and permanent injuries in the sum of $8020, including the $500 which should have been deducted, and we are unable to say from all the evidence that, laying aside any mitigation for contributory negligence and the alleged assumption of risk, the remainder—$7520—would be excessive.   This method of attempting to separate the injury into constituent parts, when carried to the extent shown in this and in many other cases, is not in accord with the spirit and purpose of the statute requiring the jury, when requested, to "find upon particular questions of fact."   (Civ. Code, § 294.)

(See, also, *Williams v. Withington,* post, 129 Pac. 1148.)

Complaint is made that the jury were instructed that the burden was upon the defendant to show contributory negligence, and also, that the plaintiff was guilty of such negligence, because of the conflict and incongruity of such instructions.   Ordinarily such burden is upon the defendant, and if removed by admission or by determination of the court, so that the defendant has the benefit of such admission or removal, an instruction of the ordinary kind can not be materially prejudicial.

The judgment is reversed and the cause remanded with directions to grant a new trial.