No. 18,892.

ERNEST M. JONES, by IDA M. JÓNES, as Guardian, etc., *Appellee*, v. THE SOUTHWESTERN INTERURBAN RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. MENTAL INCOMPETENCY OF PLAINTIFF—*Wife as Guardian Substituted as Plaintiff after Action Begun—No Material Error.* When the action was called for trial it appeared that the plaintiff was mentally incompetent to maintain the suit. Afterwards, by order of court, his guardian was substituted as plaintiff, and an amended petition was filed entitled in the name of the guardian. *Held*, that the order should be regarded as one permitting the guardian to prosecute for the ward and that the petition should be construed as if entitled in the name of the plaintiff by his guardian.

2. TRIAL—*Special Questions for Jury—When Duty of Court to Submit.* Under the circumstances stated in the opinion, it is held that it was the duty of the trial court to supervise a list of seventy-one special questions, tendered in due time for submission to the jury and containing proper and improper questions which were intermingled, strike out those which were improper and inconsequential, require the attorneys presenting the list to properly arrange and typewrite the questions approved, and then submit those questions to the jury.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed July 7, 1914. Reversed.

*W. P. Hackney,* and *J. T. Lafferty,* both of Winfield, for the appellant.

*A. M. Jackson, A. L. Noble, S. A. Smith,* and *Roscoe Bell,* all of Winfield, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Ernest M. Jones, an employee of the defendant, commenced the action to recover damages resulting from personal injuries sustained by the derailment of a car operated by the defendant, on which he was riding. When the case came on for trial, it appeared that the plaintiff was then mentally incompetent to maintain the suit. A continuance was taken and his wife was appointed guardian of his person and estate. On motion, the guardian was substituted as plaintiff in the action and filed an amended petition. Issues were made up and tried and the plaintiff recovered. The defendant appeals.

It is argued that since the action was instituted by a person incapable of doing so no action was pending when the guardian was substituted as plaintiff; that the cause of action continued to be the property of Jones and did not become the property of the guardian; and consequently the court was without authority to make a substitution of parties and to proceed in the cause.

From the first petition it appeared that a cause of action existed in favor of Jones which it was the guardian's duty to prosecute. All that was necessary was that a responsible person conduct the litigation for the imbecile. The statute of limitations had not run, the situation of the defendant had not changed, and it would have served no beneficial purpose to require the guardian to begin again my making new service. Technically the order should have been one permitting the guardian to prosecute for her ward instead of an order of substitution, and technically the amended pleading should have been entitled, "Amended petition of Ernest M. Jones, by Ida M. Jones, guardian of his person and estate," instead of "Amended petition of Ida M. Jones, as guardian of the person and estate of Ernest M. Jones." The irregularity, however, was formal and not

substantial, did not prejudice the defendant in any way, and consequently should be disregarded.

Several grounds of negligence were charged against the defendant—faulty construction of the car, inadaptability of the car to the use to which it was put, and the rate of speed at which it was propelled. It was also contended that Jones was riding on the car at the direction of the defendant's foreman. Evidence was introduced and the court charged the jury on all these matters.

There was some slight evidence to support the defenses of contributory negligence and assumption of risk which the defendant interposed and which the court submitted to the jury under appropriate instructions.

One of the defenses was that the defendant had settled with the plaintiff for his injuries, and a contract of settlement executed and acknowledged by the plaintiff and his wife and a receipt for the consideration paid them were pleaded.

There was evidence that the contract of settlement originated in a remark made to the defendant's foreman by Jones while at the hospital that he wanted to know what the company was going to do, as he had run out of money. The remark was communicated to the defendant's superintendent, who soon afterwards visited Jones at the hospital. At the time of the visit Jones was in as good mental condition as before the injury, was feeling well, was cheerful, and had been advised by his doctors that he would be out of the hospital in a week or ten days. Jones suggested that he be paid $250. Terms of settlement were freely and fairly discussed and finally agreed on. The terms were that Jones should be paid his wages until the time it was believed he would be at work and $10 more ($100), and that the defendant should pay his doctors' bills and hospital fees. The next day the superintendent returned to the hospital with a written contract of settlement and a receipt, for execution. The contract was

shown to Jones and his wife, and Mrs. Jones was asked if she wanted to read the paper. She replied, "No, you read it and then we will all hear it." The superintendent then read the papers aloud. Some discussion of the terms of settlement took place, and the instruments were signed by Jones and his wife, who acknowledged the execution of the contract before a notary public. The sum of $100 was then paid in cash and the doctors' bills and hospital fees were afterwards paid. This evidence was corroborated by witnesses who were present when the settlement was arranged and when the instruments were signed, and by others. On the other hand, there was evidence that Jones's mind had not been right at any time after the injury, that Mrs. Jones asked to be permitted to read the contract and the superintendent said it was of no use, that it had been read to her, and that Mrs. Jones did not understand what she had heard read. The court instructed the jury fully on these important matters.

At the close of the testimony the defendant submitted to the court a number of instructions and seventy-one special questions, with the request that the instructions be given to and the questions be answered by the jury. On the following day the request relating to the special questions was refused. The record reads as follows:

"The court refuses to submit any of said special questions, for the reason that in the opinion of the court improper and proper questions were so unreasonably numerous and intermingled that it would require the court to expend an unreasonable amount of his time and labor in order to redraft the same."

At the same session of the court the jury were instructed and the cause was argued by counsel for the respective parties. The refusal to submit the special questions is assigned as error.

The questions were too numerous, and proper and improper questions were intermingled. Sufficient deliberation was not given to the preparation of the ques-

tions, but no "catch questions" appear. It can not be said that the list shows bad faith, and the court did not so find. From the brief it appears that twelve consecutive questions relating to damages for injuries suffered were submitted under a mistaken view of the right of the defendant in such cases. (*Barker v. Railway Co.*, 88 Kan. 767, 783, 129 Pac. 1151.) Many of the questions related to undisputed facts, others do not now seem important, but others related to the vital and controlling facts of the case.

It was entirely proper to inquire what the jury regarded as the defect in the construction of the car, wherein they believed it to have been improperly used, at what rate of speed it was running when the derailment occurred, and what employee of the defendant, if any, directed the plaintiff to ride on the car. Plain questions, although somewhat brief, were asked on these matters.

The defendant was clearly entitled to know on what ground of negligence charged the general verdict was predicated. (*Cole v. Railway Co.*, ante, p. 132, 139 Pac. 1177.) Two of the questions, differing in form but of the same import, fairly presented that subject.

It was especially important that the facts relating to the settlement be found. The following questions bearing on the fairness and validity of the settlement were proper and very material:

At whose request did Somermier, superintendent of the defendant, call upon the plaintiff and discuss a settlement?

Did the plaintiff have a conversation with Somermier and William Jacobs with reference to a settlement for the injury which the plaintiff claimed to have sustained on June 15, 1910?

Did the plaintiff at any time make any request or demand of said W. H. Somermier for any larger sum than one hundred dollars, the hospital and surgeon bill, prior to and including the time the release was signed?

Did Somermier make any misrepresentations to the plaintiffs with reference to the contents of the written instrument or release which the plaintiff signed?

Did Somermier, the defendant's superintendent, read such written instrument or release to the plaintiff before plaintiff signed the same?

At the time the plaintiff signed the contract of settlement and received the $100 in cash from the defendant did the plaintiff know and understand what he then did in the matter?

Was the plaintiff's brain injured to such an extent as to render him incapable of understanding his act when he made the settlement and signed the papers in evidence?

How long after his injury was it before the plaintiff became mentally incapable of transacting business?

Two questions relating to the time the plaintiff had been working with the car and his knowledge of its construction bore upon issues submitted to the jury, but were not of special importance. Two questions bearing on the subject of damages were proper in form and content.

The result is that all the issues could have been reasonably well covered by seventeen questions. That number was fairly required for the purpose, however, and that number of proper questions covering the issues was tendered.

When the trial occurred the following statute was in force:

"In all cases the jury shall render a general verdict, and the court shall in any case at the request of the parties thereto or either of them, in addition to the general verdict, direct the jury to find upon particular questions of fact, to be stated in writing by the party or parties requesting the same. When the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly." (Civ. Code, § 294.)

This section of the code has since been amended by inserting the following proviso:

"Provided that no one party shall in any case be entitled as a matter of right to request more than ten such special questions but the court may in its discretion allow more than ten special questions." (Laws 1913, ch. 239.)

The legislature recognized the fact, known to all judges and practitioners, that juries may render general verdicts that do not square with the facts in the case and with the instructions of the court. The only way to test the work of the jury is by requiring them to find the facts, and when the special findings and the general verdict disagree the special findings must control. Besides this, special findings give the trial court when reviewing the case on a motion for a new trial, and this court on appeal, a grasp of the controversy which can be obtained in no other way.

Under the statute a party to an action has a right to special findings of fact which does not rest in the discretion of the trial court, and this court has so declared many times. The right to special findings, when requested, is placed in the statute beside the right to a general verdict. The right to special findings, however, is subject to regulation by rule, and is subject to certain conditions which the practical administration of justice makes essential. Thus the application must be timely, the questions must be proper in form, and they must elucidate the facts. They can not be used to cross-examine or to confuse or entrap the jury, and other limitations exist. But unless the right be justly forfeited in some way the court must recognize it.

The number of findings requested is not alone a test of propriety. In lengthy and involved cases many findings may be necessary to develop the essential facts. Proof of this may be found in the extended findings of the court itself when sitting as a trier of the facts in cases of magnitude. Long lists of ques-

tions, however, frequently consume the time of the court and the jury to no purpose, and questions are sometimes multiplied to cloak a purpose ulterior to that in the mind of the legislature.

The request for special findings presents a problem frequently difficult for the trial lawyer to solve to his own or the court's satisfaction. Very often he can not know just what questions should be chosen to make up the limited number he is permitted to ask, or just how to frame them, until the evidence is all in. Yet questions ought to be submitted by that time if possible for the benefit of the court in instructing the jury and for the benefit of opposing counsel.

Any earnest lawyer's zeal is likely to lead him to exuberance. The pressure of time and of the trial may lead to lack of precision in thought and lack of clearness in expression. When the faculty of order and logical sequence was given to mankind it seems there was not enough to fully equip all the lawyers, not even all those who are on the bench; so the court has supervisory power over requests for special findings as a matter of practical necessity arising from the nature of trial procedure. The duty in this respect was stated in an opinion of this court written by Mr. Chief Justice Martin in the case of *A. T. & S. F. Rld. Co. v. Ayers*, 56 Kan. 176, 42 Pac. 722.

"If the questions are plain and direct in form, are within the issues, are not repetitious, and there is evidence upon which they may be intelligently answered, they ought to be submitted, so that the detailed facts may appear of record. . . . It is generally error to refuse to submit questions of fact drawn in proper form, material to the case, and based upon the evidence. Section 286 of the civil code has been uniformly held to grant a right to the parties to have proper questions of fact submitted to the jury. . . . Of course, it is the duty of the court to revise the questions, to strike out or amend those drawn by the attorneys in improper form or equivocal in their meaning, and those outside

Jones v. Interurban Railway Co.

of or immaterial to the issues, as also such as are not based upon any evidence in the case. (*Mo. Pac. Rly. Co. v. Holley*, 30 Kan. 465, 472, 473.)" (p. 180.)

In the Holley case Mr. Justice Brewer, speaking for the court, said:

"It is the duty of the court to supervise the questions presented—to select the most important, and arrange them in a clear and natural manner. Thus a symmetry and order will be preserved which will tend to secure truth and justice. The case will go clearly to the jury, and the answers will be more apt to be harmonious and consistent. Of course the object is to get at the facts, and the more clearly and orderly the matters are presented, the more certainly will the facts be ascertained. And over this, as of other matters, the court must exercise a supervision. We do not mean that the court is called upon to write out questions, or that it should be particular and precise about the phraseology of counsel, for it is the party and not the court that is seeking answers as to particular facts; but only this, that the court should require the parties to present an orderly arrangement of questions, should strike out the trifling and unimportant, and should not permit the jury to be confused and the case lumbered up with useless matter." (p. 473.)

This business of revising requests for special findings takes time and labor, but so do the preparation of instructions and other matters connected with the trial. Time must be taken and labor must be expended sufficient to try cases according to law and with the end in view of closing the litigation if possible; for just behind the lawyers, who sometimes mistake or misapply or abuse procedure, stand the real parties in interest, the clients who must pay the bills.

In this case the list of special findings was submitted at the close of the evidence on the day before the jury were instructed. The court had a clear grasp of the issues and of the evidence, as his lucid and logical instructions to the jury show. With the evidence thus in mind it should not have consumed very much time

and should not have been very burdensome to go through the list, checking proper questions and striking out those which were improper and inconsequential. In the instance referred to twelve questions would have gone out at one stroke of the pen. Much space was rightly given in the instructions to the subject of the validity of the settlement, and practically all of the questions relating to that subject fell directly under the instructions and were quite easily segregated. If the list, marked as indicated, had been handed to the defendant's attorneys with direction to do so, the few approved questions could have been arranged and typewritten while the instructions were being read to the jury.

Much as this court dislikes to disagree with the conscientious and painstaking district court, the matter being one of right and not of discretion, and the attorneys for the defendant having acted in apparent good faith and without desire to oppress either the court or the jury, it is concluded that the request for special findings should not have been wholly denied.

Since the case is to be tried again it is not necessary to discuss other assignments of error.

The judgment of the district court is reversed and the cause is remanded with direction to grant a new trial.